**DANAHO REFINING COMPANY,**
Appellant,

v.

**PAN AMERICAN PETROLEUM CORPO-
RATION et al., Appellees.**

No. 4275.

Court of Civil Appeals of Texas.

Waco.

Oct. 22, 1964.

Rehearing Denied Nov. 12, 1964.

Kelley, Ryan & Merrill, Houston, for appellant.

Vinson, Elkins, Weems & Searls,. Houston, William E. North, San Antonio, Baker, Botts, Shepherd & Coates, William R. Choate, J. L. Bianchi, Ernest H. Brown, Dean J. Capp, Houston, Morrison, Dittmar, Dahlgren & Kaine, San Antonio, Maco Stewart, Galveston, and Sidney Farr, Houston, for appellees.

WILSON, Justice.

Danaho Refining Company appeals from a take-nothing judgment on an instructed verdict in its action against appellees in which Danaho sought $5,000,000 actual and exemplary damages arising out of alleged violations of the Texas anti-trust laws, Arts. 7426–7447, and of Art. 6008b, Vernon's Ann. Tex.St., and an alleged common law conspiracy. We affirm.

Danaho sued some 20 individual and corporate owners of the Burnell-North Pettus recycling plant and Triangle Refineries, Inc., alleging that these appellees and others, by their method of operating the plant and the marketing of liquid petroleum products therefrom, had unlawfully combined contrary to the Texas anti-trust laws and had entered into an agreement or conspiracy in contravention of the common law for the purpose of injuring or destroying Danaho's business, and that their conduct proximately caused the damages prayed for. An injunction was sought.

The petition alleged that plaintiff Danaho acquired a small refinery in Bee County in 1945 which it improved and developed; that its business was profitable until 1958, when the volume and profit of its business began a gradual decline culminating in the loss of all its business and in insolvency. It was pleaded that in 1947 appellee plant owners· and others had unitized their oil and gas. leases and commenced joint operation thereof in the Burnell and North Pettus Fields in three counties; that in 1949 appellees and others not parties jointly constructed, operated and owned a gas gathering system and gas recycling plant three

miles from the Danaho refinery, committing themselves to deliver their gas production to the plant; that the plant made finished motor gasoline and other refined products which were held in and sold from jointly owned and operated common storage tanks. It was averred that the plant-owner appellees entered into identical written contracts with appellee Triangle under which the plant products were sold by Triangle in the same marketing area as Danaho's; that Triangle collected the proceeds of sales, retaining 4% and remitting 96% for distribution among the appellee plant owners in accordance with their respective ownership interests; that the owner of the largest plant interest, Pan American Petroleum Corporation, was made plant operator, acting for all owners at their joint expense in supervising operations, delivery of products and accounting, under general advice of a plant committee; that appellees also so refined and marketed gasoline from the production of others who owned no interest in the plant.

Danaho pleaded that appellees began about 1958 to "fix prices and to otherwise conspire together in such manner as to drive" it out of business and eliminate it as a competitor; that acting through Triangle they cut their gasoline prices below Danaho's prices, causing decrease in volume sold by Danaho to its customers, and increase in volume bought from appellees, thereby depressing price levels below those which would have prevailed under fair competition; that appellees used price discounts for payments made within a specified time and for large volume purchases; that lower prices were charged Danaho's customers than others; that usurping of Danaho's market reduced its refinery "throughput" thereby increasing its cost, reducing its profit and impairing Danaho's ability to buy charge stocks (liquid hydrocarbons to be refined); that appellant had tried to buy charge stocks produced by appellees but was unable to do so on a reasonable basis, but in 1960 some of appellees sold to it such products at a price 50¢ above the market

price. It was also alleged that appellees had conspired to destroy Danaho's credit and business standing by disparaging utterances and wrongful conduct.

It was asserted that appellees' conduct had decreased Danaho's gasoline sales 160,-000,000 gallons below what the volume "could reasonably have been expected to be" and that its revenues had been decreased from 1¢ to 2¢ per gallon; that the profitability of Danaho's operations were "proportionate to the volumes of charge stock run through its refinery and that the unlawful conduct of defendants has, since 1957, decreased such throughput by 2,000,000 barrels below what plaintiff could reasonably have expected." It claimed the value of its refinery had been destroyed except for salvage.

After a two weeks' trial the court sustained appellees' motion for instructed verdict which asserted, among other grounds, that there was no evidence tending to show a conspiracy or agreement to cause plaintiff harm, injure its business, impair its credit, control gasoline prices or deprive it of charge stocks; that there was no evidence of a combination for any purpose prohibited by statute; and that there was no evidence of any causal connection between any alleged conduct of appellees and Danaho's claim of loss or injury.

Danaho's points attacking the instructed verdict are to the effect that the evidence shows appellees' combined marketing activities and refining operations constituted per se violations of Arts. 7426, 7427 and 6008b, which caused damage to Danaho; and the evidence raised issues as to whether appellees combined and conspired to, and did drive appellant out of business.

There is no direct evidence of any agreement, combination or conspiracy by appellees to drive Danaho out of business, and it is unnecessary for us to decide whether the circumstances shown would raise such issues, or whether the evidence makes issuable the violation of the enumerated statutes. Much of the eight-volume record, the

numerous exhibits and appellant's briefs are devoted to these matters. We are convinced the action of the trial court was proper because there is no evidence beyond a scintilla that appellees' conduct caused the injury of which Danaho complains. To demonstrate this conclusion it is necessary to summarize briefly the applicable record, much of which consists of admissions of appellant's president at the trial.

Although Danaho ascribes the extinction of its business to loss of volume and profits resulting from appellees' conduct only after 1957, it is necessary to examine the circumstances from the beginning.

Danaho, a corporation organized by its president, Hovey, bought a small refinery at Pettus in 1945 for $40,000 cash and a note for $100,000. It was "one step above junk". In 1946 a thermal cracker was added, and in 1955 a platformer was installed. These and other improvements cost over $1,000,000 for which the plant was from time to time mortgaged. It continued to be encumbered until a 1957 mortgage securing a $420,000 indebtedness was released in 1962. In 1945 the refinery had a daily crude oil refining capacity of 1000 barrels "throughput". The capacity was increased after the first four or five years until in 1954 it reached 5000 barrels per day, but during this period it was not "running to its then capacity from year to year", except for the earlier years. Never thereafter did the refinery operate at capacity. The maximum throughput "in all those years was between 3500 and 4000 barrels." In 1951 it operated at 60% capacity. It was "down to about 40% in 1954." Notwithstanding, the following year Danaho increased the plant capacity to 10,000–12,000 barrels per day based on the expectation of completing a pipeline to San Antonio. The latter project had to be abandoned in 1956 because of Danaho's inability to market $1,500,000 securities, and there was no need for the expensive capital improvements by which the capacity had been enlarged. The securities marketing expense to Danaho was $300,000, and the preparations for the anticipated improve-

ments cost many thousands more. The entire refinery was shut down for six months. The previous expansion units had been shut down before, after only five years' operation. The thermal cracking unit, which had cost $250,000, was "shut down between 1954 and 1956 because it was no longer practical to run it." Danaho was seeking additional capital to replenish that depleted by its difficulties, and was then having difficulty in negotiating essential bank loans. It was required to exhaust operating capital in paying off its mortgage bonds and debentures.

Danaho's current liabilities exceeded its current assets every year from 1950 to 1963, its president testified. The "working capital was a red figure for each of the years 1950 to 1963 inclusive." No dividend was ever paid on its common stock. "In 1954 and 1955 Danaho Refining Company was broke" he said.

Danaho had been selling 40% of its output to the United States Air Force as jet fuel. It lost that business in 1954 when its contract was not renewed. Nearly half of its sales total was thereby lost. In 1958, Hovey testified, Danaho reduced its gasoline production in order to increase output of jet fuel, for which it had no market, in an attempt to diversify.

Beginning in 1954 another 20% of Danaho's total production was being sold to Humble Oil & Refining Co. In 1961 or 1962 Humble, which had been "Danaho's largest purchaser of gasoline", obtained its own supply source and built a recycling plant in the area, and Danaho consequently lost that business.

Danaho's next two largest purchasers of gasoline were Sigmor Oil Company and Sunset Service Company in San Antonio. In 1961 or 1962 some of Sunset Service's retail outlets were bought by Signal Oil & Gas Company, which had its own refinery. In 1962 the Sunset Service was divided so that a third of its stations were acquired by Phillips Petroleum Company, and another third were sold to Hancock Oil Company.

Sigmor, the other large account, sold out to Shamrock Oil & Gas Company about the same time.

Danaho points to records which show a comparison of its gasoline prices with Triangle's beginning in 1958, and which reflect that during most of the period covered to 1962 Triangle's prices to Sunset and Sigmor were from $1/8¢$ to $1/2¢$ or more lower than Danaho's. It then urges a correlation between this fact and Danaho's declining volume of sales during the same period.

Danaho's peak sales volume was reached in 1957 with 35,232,322 gallons sold. Sales decreased as follows: 1958, 26,613,206; 1959, 22,422,807; 1961, 16,768,879; 1962, 5,034,782. Danaho's profit per barrel, however, fluctuated as follows: 1957, 7¢; 1958, 8¢; 1959, 9¢; 1962, 1¢. Its records show, notwithstanding, that its greatest throughput since beginning operations was in 1960, when it substantially increased the preceding annual sales, but sustained thereby a 4¢ per barrel loss. The record establishes that most of Danaho's prices were for 90 octane gasoline, while Triangle's was for 87 octane. During several months of the period where 90 octane sales are compared, Danaho's prices are lower than Triangle's. The evidence shows that Danaho's sales of regular gasoline to customers it does not contend Triangle competed for likewise decreased after 1957.

Triangle had other competitors in the market area besides Danaho. Some of these had "taken business away" from Danaho. The price comparison with these competitors is not shown. Danaho's president testified in response to his counsel's questions: "Q. Mr. Hovey I will ask you whether or not, in order to hold volume of finished products produced at the Danaho plant, that *you* have had occasion from time to time to cut prices? A. We have. Q. Is that common or not in a marketing area such as the San Antonio area? A. That is common. Q. How else can *you* hold volume except on some character of a price basis in selling finished products from any refinery? A.

That is the major factor. The quality is the next. Q. Is it true that each time *you* cut *your* prices to meet competition that Triangle would in turn cut its price?" (Objection sustained).

Danaho manufactured and sold premium or ethyl gasoline; Triangle did not. Thus, Triangle did not compete with Danaho on sales of this product. Danaho's 98 octane premium gas was sold to various outlets in its San Antonio and Austin market area other than those to which Triangle sold. After 1957 Danaho's sales of premium gas declined 50%, just as had its sales of "regular" gasoline, and it (about 1960) shut down its facilities for making this product, and thereafter bought its premium gas supply from Suntide Oil Co. Danaho's president listed five Danaho area competitors on gasoline sales. His San Antonio refinery competitors had a 76 mile transportation cost advantage on gasoline which amounted to $3/4¢$ per gallon. The president testified that two of his competitors, Howell and Monarch had "a competitive advantage over Danaho in the San Antonio area". This advantage did not exist, he testified, "over gasoline made at the Burnell plant."

When asked by his counsel why, with such a large volume of throughput in 1960 Danaho "showed a red figure", president Hovey answered that it was because, in 1960 Danaho "started buying Magnolia's recombined stream" of previously extracted petroleum components, or charge stock, for $3.58 per barrel and "the more we ran, the more we lost." Appellant urges testimony that this price was 50¢ above the posted price as being the cause of its loss.

Danaho bought the entire "recombined stream" of the Pettus-Burnell plant for the last five months in 1960. It bought "with its eyes open." It bought the following year in order that it could obtain a "chance it could get the rest of the Burnell production." Appellant solicited this purchase on its own initiative. Notwithstanding it lost money on its refining of this stream, it sought and obtained another such contract

for the combined stream for the year 1961. It was permitted to terminate the contract unilaterally by acquiescence of the appellee sellers, who had a contractual right to require Danaho to continue buying. Thereafter Danaho purchased from some of appellees. Before 1960 Magnolia had been using its own portion of the plant product and buying the share of other plant owners. When Danaho solicited the purchase of the combined stream, it did so knowing that Magnolia had an offer from another company, Suntide, to buy at the same $3.585 price which Danaho offered to pay. Suntide is not a party here. The previous sellers to Magnolia were also solicited by Danaho to sell it their portions, and Danaho prepared identical written contracts with each. Although appellant obtained only a part, it "tried to buy all of the commingled stream" of the Burnell plant. Later, Danaho sold to Suntide the very combined stream it bought, without processing the stream, and at $3.585 per barrel. These circumstances do not raise an inference that appellant's financial state was caused by appellees' conduct.

■ To shorten the opinion we simply state that in our view the claim that any conduct of appellees impaired Danaho's credit, caused banks to call its loans, made the obtaining of loans more difficult, or improperly tied up Danaho's capital funds by unduly harsh requirements as to bank letters of credit or cash payments is not supported by any circumstance which creates as much as a reasonable surmise.

Finally, appellant says the court erred in excluding the opinions of Danaho's former manager (1) as to "what has been the prime cause of the decline in Danaho's business" since 1957, (2) as to whether Triangle's marketing practices "had any effect on the wholesale market price of regular gasoline" since 1957, and (3) whether appellees' "conduct had any effect on Danaho's ability to obtain charge stocks for its refining operations." Although appellant states the excluded evidence "was neither opinion nor

did it pertain to the ultimate issues in the case", we view its argument as expressing contrary notions, else it would be immaterial. The opinion was invoked on the issue of causation, the very ultimate issue now under consideration.

The bills of exception show the excluded answers would have been: (1) "The prime cause I believe is pretty well shown by these records here" (in evidence) "which shows the competition of material from the Burnell plant as the prime cause of that decline"; (2) "Yes" and (3) "I would say it did."

The first segment, as the witness would have pointed out, involved nebulous "competition of material". The second and third, referring to "marketing practices" and "conduct" clearly called for conclusions.

■ The same rules of evidence concerning cause of damage apply in this type of action as are applied generally. 58 C.J.S. Monopolies § 101, p. 1132. The proximate cause of damage is not ordinarily the proper province of opinion evidence in tort cases. The deduction, speculation, inference or surmise of a witness "that a certain consequence is the result of some preceding event" is properly excluded "when the data observed by the witness can be concretely portrayed so that the jury is put in an equal position with the witness to draw inferences." 2 McCormick & Ray, Texas Law of Evidence, Sec. 1399, 1397 pps. 230, 225, and cases cited. The rule is stated in 15 Am.Jur., Damages, Sec. 352, p. 791: "A witness should not be permitted to give his opinion that plaintiff was injured in his credit or business by the defendant's acts." See Norvell, 31 Tex.L.Rev. 731; Galveston Tribune v. Johnson, Tex.Civ.App., 141 S.W. 302, writ ref.; Da Moth & Rose v. Hillsboro Ind. School Dist., Tex.Civ.App., 186 S.W. 437, writ ref.; Carter v. Lindeman, Tex.Civ.App., 111 S.W.2d 318; Wilderspin v. Bewley Mills, Tex.Civ.App., 298 S.W.2d 636, writ ref. n. r. e.; Chuppe v. Gulf Iron Works, Tex.Civ.App., 306 S.W.2d 177, writ

ref., n. r. e. Under this record the exclusion was not reversible error and the proffered evidence does not, in our opinion, affect the result. The judgment is affirmed.

McDONALD, C. J., not participating.