**SCURLOCK OIL COMPANY,**
Petitioner,

v.

**Maria C. SMITHWICK, Individually et
al., Respondents.**

No. C–4838.

Supreme Court of Texas.

Nov. 26, 1986.

Concurring Opinion June 25, 1986
(J. McGee).

Rehearing Denied March 11, 1987.

James A. Kronzer, Jr., Weitinger, Steelhammer & Tucker, Jack W. Tucker, Jr., Houston, White Huseman, Pletcher & Powers, Anthony Pletcher, Corpus Christi, James A. Smith, Port Lavaca, for petitioner.

Edwards, McMains, Constant & Terry, William R. Edwards and Russell H. McMains, Hunt, Hermansen, McKibben & Barger, Lev Hunt, Corpus Christi, for respondents.

## OPINION ON MOTION FOR REHEARING

KILGARLIN, Justice.

Our opinion of June 25, 1986 is withdrawn, and the following is substituted.

Two principal questions confront us: (1) the admissibility of a "Mary Carter" agreement from a prior trial which involved the same defendants but different plaintiffs; and, (2) the collateral estoppel or issue preclusion effect to be given to jury findings made in the prior trial.

As a result of a van/truck collision in Victoria County in December, 1982, two men were killed. The heirs of one man, George Smithwick, filed suit in Nueces County against Missouri Pacific Railroad Company, Scurlock Oil Company and its driver, Ernest Lewis, and Victoria Carrier Service and its driver, Ronnie Wayne Bounds. The other man killed in the accident was Clay Carroll Dove, and his heirs filed suit in Matagorda County against the same defendants.

The *Dove* case was tried first, resulting in a verdict favorable to the Dove heirs. In that case, the Dove heirs had entered into a "Mary Carter" agreement with Scurlock Oil Company. The Smithwick heirs, in their case, entered into a "Mary Carter" agreement with Missouri Pacific. As impeachment evidence in the Smithwick case, the trial judge admitted the "Mary Carter" agreement between the Doves and Scurlock. Based on the jury verdict, the trial court rendered a $4,165,557 judgment for the Smithwicks against Scurlock Oil Company. The court of appeals affirmed that judgment. 701 S.W.2d 4. We reverse the judgment of the court of appeals and remand this cause to the district court of Nueces County for a new trial.

Smithwick and Dove were employees of Missouri Pacific Railroad Company. At the time of their death, they were being transported from the railroad's station in Bloomington, Texas, to Vanderbilt, Texas, where they were to perform duties for their employer. Scope and course of employment is not contested. Rather than use its own vehicles or employees, Missouri Pacific had engaged Victoria Carrier Service, and its driver, Bounds, to transport the men. At a point near a curve in the roadway, Bounds had pulled his vehicle off the opposite side of the road from which he was headed, and, it being nighttime, had left on the van headlights. A large oil transport truck, driven by Scurlock's employee, Lewis, was coming from the direction of Vanderbilt, headed toward Bloomington. The truck driver, seeing the lights ahead, pulled off on his side of the road, the side on which the van was stopped, and collided with the van, killing Smithwick and Dove.

In the Matagorda County action, brought by the Dove heirs, Scurlock entered into a guaranty with those heirs that they would recover at least 2.5 million dollars. A jury trial resulted in a finding that Missouri Pacific, through its borrowed servant,

Bounds, was 90% negligent, and that Scurlock was 10% negligent. At the time that the Smithwick case went to trial in Nueces County, judgment was not yet final in *Missouri Pacific Railroad Co. v. Bert L. Huebner, Administrator of the Estate of Clay Carroll Dove, Deceased*, 704 S.W.2d 353 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). Because *Dove* was still on appeal, Scurlock sought to abate the Smithwick trial until the Dove judgment became final, in order to benefit under a collateral estoppel theory from the jury's finding of Missouri Pacific's 90% negligence. The Nueces County District Court overruled the plea in abatement, and the Smithwick case proceeded to trial.

In this case, Missouri Pacific entered into a "Mary Carter" agreement with the Smithwick heirs, also guaranteeing a minimum recovery of 2.5 million dollars. Though the details of this agreement were not read to the Smithwick jury, the jury was advised during voir dire examination by Smithwick's lawyers of the Missouri Pacific guaranty, and the guaranty was commented on by Scurlock's lawyer during closing argument. Although the Smithwicks had non-suited Scurlock's driver, Lewis, who, by the time of trial, had retired, they called Lewis as an adverse witness, and after examining him as to the details of the accident, sought to impeach him with the "Mary Carter" agreement between the Doves and Scurlock, an instrument he had not signed. Scurlock, of course, interposed numerous objections to these questions of Lewis.

Thereafter, before resting, and without any witness on the stand, Smithwick's attorney was permitted, over objection, to state and read to the jury the following:

> Your Honor, this is the portion of Plaintiff's Exhibit 72 which has been offered and has been admitted by the Court. This is an agreement in Cause Number 83–H–0157–C, *Bert L. Huebner, Administrator of the Estate of Clay Carroll Dove, deceased, and on Behalf of Roselyn Helen Dove, Stephanie Rose Dove, and Trey Carroll Dove v. Missouri Pacific Railroad, et al.*—and that just means others—in the District Court of Matagorda County, Texas, 130th Judicial District. Agreement: 'This agreement is made and entered into for the purposes set forth fully below by the following parties. Bert L. Huebner, Administrator of the Estate of Clay Carroll Dove, deceased, acting on behalf of Roselyn Helen Dove, widow of Clay Carroll Dove, Stephenie Rose Dove and Trey Carroll Dove, the minor children of Clay and Roselyn Helen Dove, Mr. and Mrs. Homer Dove, parents of Carroll Dove and Scurlock Oil Company.
>
> On December 9, 1982, Clay Carroll Dove was killed while he was in the course and scope of his employment for Missouri Pacific Railroad Company. Mr. Dove went on duty at the railroad station in Bloomington, Texas, and he and his crew were told to go to Vanderbilt, Texas, to perform duties for the railroad. Scurlock Oil Company has agreed to accept the guaranty of Mr. Huebner on behalf of the remaining Dove family that Mr. Lewis and Scurlock Oil Company will never be required to pay more than Two Million Five Hundred Thousand Dollars in damages regardless of the verdict of the jury in this case.' And that's the end of that offer, Judge.

The court of appeals, in this case, determined that the examination of a non-party to establish an unquestionably prejudicial guaranteed settlement agreement from another trial, after that witness denied knowledge of the agreement, was erroneous. However, the court of appeals concluded that Scurlock had waived the error. The basis for the appellate court's conclusion that error had been waived was because Scurlock's lawyer, during closing arguments, had commented on both the Dove-Scurlock agreement and the MoPac-Smithwick agreement. We agree that the introduction of the Scurlock-Dove agreement was error. We disagree that Scurlock waived such error, and we further disagree with the additional conclusion of the court of appeals that such error was harmless because Scurlock did not complain of excessiveness of damages awarded the Smithwicks.

**4**

As we said in *General Motors Corp. v. Simmons*, 558 S.W.2d 855 (Tex. 1977), "[t]he traditional Texas rule is that settlement agreements between the plaintiff and a co-defendant should be excluded from the jury. A contrary rule would frustrate the policy favoring the settlement of lawsuits." *Id.* at 857. However, in *Simmons*, we qualified that rule by saying that when a settling defendant retained a financial stake in a plaintiff's recovery, the excluding of evidence of that fact from the jury was harmful error. *Id.* at 858–59. In order to show bias, Scurlock was entitled, in this case, to impeach Missouri Pacific's testifying principals or agents as to the guaranty to the Smithwicks if those persons sought to aid the Smithwicks recover. *Clayton v. Volkswagenwerk*, 606 S.W.2d 15 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). Of course, the Smithwicks preempted Scurlock by mentioning the matter during voir dire examination. *Clayton* prohibits voir dire disclosure of "Mary Carter" agreements, but, obviously, Scurlock would have no grounds to complain of error. Nevertheless, impeachment is the proper method by which relevant portions of "Mary Carter" agreements may be brought to the jury's attention. In the Dove case, Missouri Pacific was similarly entitled to show Scurlock's guaranty to the Doves.

Rule 408 of the Texas Rules of Evidence states:

> Evidence of (1) furnishing or offering or promising to furnish or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for, or invalidity of, the claim or its amount.

However, the rule does not require exclusion when the evidence is offered for the purpose of proving bias or prejudice or interest of a witness or party. The Smithwicks argue that the "Mary Carter" agreement between Scurlock and the Doves was admissible to prove bias and interest of Lewis. We find this argument unpersuasive. The settlement agreement was entered into between Lewis' employer, Scurlock Oil Company, and the Doves. Lewis did not sign the agreement, and there was absolutely no showing that Lewis was in any way interested in the outcome of the Smithwick case because of his former employer's settlement with the Doves. *Cf. Hyde v. Marks*, 138 S.W.2d 619 (Tex. Civ.App.—Fort Worth 1940, writ dism'd jdgm't correct). Further, were we to uphold the trial court's admitting the Dove-Scurlock agreement into evidence in the Smithwick trial, we would be discouraging any defendant faced with multiple trials from entering into a guaranty agreement in the first trial. This would be contrary to our policy favoring the settlement of lawsuits. *McGuire v. Commercial Union Insurance Co.*, 431 S.W.2d 347, 352 (Tex. 1968).

Next we consider whether Scurlock waived the error of admitting clearly incompetent evidence. Having properly objected, Scurlock was not required to sit idly by and take its chances on appeal or retrial when incompetent evidence was admitted. *State v. Chavers*, 454 S.W.2d 395, 398 (Tex. 1970). Scurlock was entitled to defend itself by explaining, rebutting, or demonstrating the untruthfulness of the objectionable evidence without waiving its objection. *Id.* at 398; *Roosth and Genecov Production Co. v. White*, 152 Tex. 619, 629, 262 S.W.2d 99, 104 (1953). We conclude that Scurlock did not waive error.

We also must consider whether the error was harmful. Although it is a matter over which we have no jurisdiction, we would assume that under the circumstances, the verdict awarded the Smithwicks was not excessive. This does not mean, however, that the introduction of the Dove-Scurlock agreement was not harmful. The jury found 100% fault on Scurlock. In a case of closely contested liability, where the accident occurred off the road, on Lewis' side of the highway, and one of the investigating officers testified that Lewis said that he thought the van was coming on his side of the road and so he went off the highway, the effect of the introduction of the Dove-Scurlock agreement to the jury

on the question of liability was clearly calculated to and undoubtedly did result in the rendition of a harmful judgment to Scurlock.

Scurlock additionally complains of the apportioning of peremptory challenges by the trial court. The trial court awarded the Smithwicks nine strikes, Scurlock six strikes, and Bounds/Victoria Carrier six strikes, who struck separately. The court of appeals concluded that Scurlock, although having objected to the apportionment, had failed to preserve error by directing the court's attention to those jurors Scurlock was forced to accept because of the apportionment. While it is the rule that when a challenge for cause is overruled, a party is required to identify an unacceptable juror that he was forced to take, we have recently held that rule is not applicable when the trial court improperly apportions peremptory challenges. *Garcia v. Central Power & Light Co.*, 704 S.W.2d 734 (Tex.1986). While disapproving of the basis utilized by the court of appeals in upholding the trial court's apportionment of peremptory challenges, we hold that under the authority of *Patterson Dental Co. v. Dunn*, 592 S.W.2d 914 (Tex.1979), and *Garcia v. Central Power & Light Co.*, the trial court did not err in its apportionment of challenges.

■ A trial court must determine, based upon information gleaned from pleadings, pretrial discovery, and representations made during voir dire examination, what antagonism, if any, exists between the parties. In this case, both Scurlock and Bounds/Victoria Carrier Service were seeking an abatement. Bounds/Victoria Carrier Service was antagonistic to Smithwick/Missouri Pacific on the issue of whether Bounds was a borrowed servant of Missouri Pacific. Furthermore, both Bounds and Scurlock denied that they were at fault, but each claimed that the other was at fault. In contrast, the Smithwicks claimed both Bounds and Lewis/Scurlock were at fault. Moreover, under the law at the time, the findings by the *Dove* jury did not have issue preclusion effect, because the judgment was not yet final.

The posture of the parties in this case differs from that in *Garcia v. Central Power & Light Co.* In *Garcia*, four defendants were clearly aligned against one plaintiff, all pointing the finger of culpability at that plaintiff, and making exculpatory statements on behalf of each other. 704 S.W.2d at 736. Thus, we held it improper to divide strikes ten for the defendants, and six for the plaintiffs. *Id.* However, in this case there was no such unity of position between the parties.

■ The trial judge, pursuant to Tex. R.Civ.P. 233, was required to determine whether any of the litigants aligned on the same side of the docket were antagonistic with respect to any issue to be submitted. We cannot say that Bounds and Scurlock were not so antagonistic to each other and to the Smithwicks, or the Smithwicks to them, based on the information the trial court had before it at the time it equalized strikes, that the apportionment of nine to six to six produced an unfair advantage for the Smithwicks.

Having concluded to remand this cause, we now turn to the last point argued by Scurlock—that trial court judgments should be final for purposes of issue preclusion or collateral estoppel despite the pendency of an appeal. Currently, Texas is one of a limited number of jurisdictions that hold that a judgment is not final for preclusion purposes while an appeal is pending. It has not always been so. In *Thompson v. Giffin*, 69 Tex. 139, 143, 6 S.W. 410, 412 (1887), the supreme court stated "an appeal in our State does not vacate the judgment below, but merely suspends its execution. Hence the judgment, if competent to establish a plea of *res adjudicata*, could not be defeated for that purpose by a writ of error presented for its review" (emphasis original).

However, six years later, the supreme court determined that the *Thompson* language was dicta and unnecessary to that opinion. In *Texas Trunk R. Co. v. Jackson*, 85 Tex. 605, 22 S.W. 1030 (1893), after recognizing division among the states on the question, this court said "in view of the conflict of decisions we feel authorized to

adopt the rule believed to be supported by the better reason, and most likely to secure the ends of justice." *Id.* at 607, 22 S.W. at 1031. While not delving into the reasoning or demonstrating how the ends of justice would be better served, this court nevertheless held that during pendency of appeal a judgment was deprived "of that finality of character necessary to entitle it to admission in evidence in support of the right or defense declared by it, and from this necessarily follows the insufficiency of a plea in bar, based on it." *Id.* at 608, 22 S.W. at 1032.

The established rule in federal courts is that a final judgment retains all of its res judicata consequences pending decision on appeal, except in the unusual situation in which the appeal actually involves a full trial de novo. *Prager v. El Paso National Bank*, 417 F.2d 1111, 1112 (5th Cir.1969). 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4433 at 308 at n. 8 (1981). "Most courts adhere to the answer established in federal decisions. Despite the manifest risks of resting preclusion on a judgment that is being appealed, the alternative of retrying the common claims, defenses, or issues is even worse." *Id.* at 313; *see also* 1B *Moore's Federal Practice* ¶ 0.416[3] at 524, n. 26.

The *Restatement (Second) of Judgments* also adopts the federal interpretation of finality for res judicata purposes, saying in section 13, comment (f), "[t]he better view is that a judgment otherwise final remains so despite the taking of an appeal unless what is called an appeal actually consists of a trial de novo."

Admittedly, there are disadvantages to the federal/restatement position. A judgment in a second case based on the preclusive effects of a prior judgment should not stand if the first judgment is reversed. *Butler v. Eaton*, 141 U.S. 240, 243, 11 S.Ct. 985, 986–87, 35 L.Ed. 713 (1891); 18 *Federal Practice and Procedure, supra*, § 4433 at 311. This potentially could create two retrials, although that outcome is not automatic. *See Restatement (Second) of Judgments* § 16.

Nevertheless, current Texas law has greater potential for harm. All of the values served by res judicata are threatened by a rule that often requires relitigation of the same issues between parties, with the opportunity, as here, for conflicting results. Ironically, Texans are frequently the victims of their own law, as demonstrated by *Nowell v. Nowell*, 157 Conn. 470, 254 A.2d 889 (1969), *cert. denied*, 396 U.S. 844, 90 S.Ct. 68, 24 L.Ed.2d 94 (1969). In that case, the Connecticut Supreme Court, relying on the Texas rule of nonpreclusiveness, determined that a Texas divorce decree, in which the husband was not ordered to pay his wife any support, although prior in date, did not bar a Connecticut judgment in which support was ordered. The reason was that the wife had appealed the Texas decree to the United States Supreme Court, and by Texas law it was not final. The Connecticut court said, "[a] Texas judgment which is pending appeal should not be given effect in another state because such a judgment is not final under Texas law." 254 A.2d at 894.

In this age of complex litigation, with multiple suits often arising from one occurrence, it ordinarily makes no sense to relitigate the same issues between the same parties, with the possibility of inconsistent results. Once litigated in a fair forum, that result should be binding. Currently, with issue preclusion not effective until all avenues of appeal have been exhausted, the victor in the first suit has little incentive to go to trial in a subsequent suit, and the first suit loser has every reason to procrastinate on appeal. Moreover, the waste of judicial time in relitigating already decided issues is apparent. Our trial courts are already overburdened with cases requiring initial determination without having to also retry questions already decided. Therefore, we now adopt the rule of the *Restatement (Second) of Judgments* § 13, and hold that a judgment is final for the purposes of issue and claim preclusion "despite the taking of an appeal unless what is called an appeal actually consists of a trial de novo." We overrule *Texas Trunk R. Co. v. Jackson* and its progeny.

Having broadly addressed Scurlock's point on the collateral estoppel or issue preclusion effect of the Matagorda County judgment, we must now decide whether issue preclusion will be applicable in this case. The resolution of this question requires us to weigh the public policy of encouraging settlements against the obvious prejudicial effects on a non-settling defendant in a "Mary Carter" situation. Such a settlement means the plaintiff and the settling defendant inevitably gang up on the non-settling defendant and jointly point the finger of liability. The settling defendant likewise argues for high damages, something usually foreign to defendants' advocacy.

Although the non-settling defendant may advise the jury of portions of the "Mary Carter" agreement, as we held in *Simmons,* we nevertheless conclude that a jury verdict in those situations is one having the potential of being obtained without full and fair litigation. How else can it be explained that the Dove jury found Missouri Pacific 90% at fault and the Smithwick jurors found Scurlock 100% at fault? Notwithstanding, for public policy reasons, we permit "Mary Carter" agreements in spite of the potential skewing of a non-settling defendant's liability. But, if we permit "Mary Carter" agreements in a prior trial in spite of such potential, and having just adopted the principle of finality of judgments for purposes of issue and claim preclusion in spite of a pending appeal, why shouldn't the findings of the prior trial be binding on future litigation of the same issues? The drafters of section 28, *Restatement (Second) of Judgments,* may well have considered this conflict when they stated:

Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:

\* \* \* \* \* \*

(3) a new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them; or

(4) the party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action; ...

■ As to whether to allow collateral estoppel and issue preclusion based upon findings in a prior trial when a "Mary Carter" type agreement was present, we would leave to the trial court discretion in this area. *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 331, 99 S.Ct. 645, 651–52, 58 L.Ed.2d 552 (1979). But in exercising that discretion, the trial court should consider certain fairness factors as outlined in *Parklane Hosiery.* Of those factors, the one applicable in terms of this case is the procedural factor of the effect of the "Mary Carter" agreement, unavailable to Missouri Pacific in the Dove case, that likely affected the quality of that trial and caused a different result. *Id.* at 332, 99 S.Ct. at 652. Thus, arguably even had the Dove's judgment been final, issue preclusion or collateral estoppel could have been improper in this case. Nonetheless, the initial decision as to issue preclusion on retrial of this case because of the possibility that the prior "Mary Carter" agreement violated "fairness factors" will rest with the trial court upon proper application of *Parklane Hosiery.*

Smithwick's and Bounds/Victoria's motions for rehearing are overruled; Scurlock's motion for rehearing is granted as to the issue preclusion point. We reverse the judgment of the court of appeals and remand this cause to the trial court for proceedings consistent with this opinion.

McGEE, J., concurs.

SPEARS and GONZALEZ, JJ., concur.

## ON MOTION FOR REHEARING

SPEARS, Justice, concurring.

My previous concurring opinion of June 25, 1986 is withdrawn and the following is substituted. I concur in the majority's judgment. I agree with the majority's holding that a trial court judgment is final for purposes of collateral estoppel despite the taking of an appeal. I would suggest as an alternative that we explore the practice of consolidation, when as in this case, our trial courts are faced with multiple suits involving the same issues and claims arising from one occurrence. Instead of numerous causes simultaneously proceeding to trial with the first to judgment precluding the relitigation of issues and claims, consolidation would avoid the evils of preclusion by offering each litigant his day in court.

Consolidation involves the joining of pending actions before one court that have "a common question of law or fact." Fed. R.Civ.Proc. 42(a). When employed, consolidation is within the court's discretion and should be invoked to foster convenience and economy in the administration of justice. *Feldman v. Hanley,* 49 F.R.D. 48 (D.C.N.Y.1969). The procedural aspects of consolidation are well detailed. *See* Wright & Miller, FED.PRAC. & PROC. § 2381–2393 (1971 & Supp.1986).

New York has successfully used consolidation when two actions are pending in separate counties which involve common questions of law and fact. A motion may be made in either county to consolidate, and generally once the decision to consolidate is made, the consolidated trial is litigated in the county in which jurisdiction was first invoked. *Woods v. County of Westchester,* 112 A.D.2d 1037, 492 N.Y. S.2d 829 (N.Y.App.Div.1985); *Matter of Schneider,* 88 A.D.2d 619, 450 N.Y.S.2d 40 (N.Y.App.Div.1982); *see also* N.Y.CIV. PRAC. LAW § 602 (McKinney 1976).

Other states, as well as New York, have enacted consolidation rules similar to F.R. C.P. 42. *See, e.g.,* ARK.R.CIV.P. 42; CAL. CIV.PROC. CODE § 1048 (West 1980); KAN.CIV.PROC. CODE ANN. § 60–242(a) (1983).

In order for consolidation to be available in Texas, amendments to the Texas Rules of Civil Procedure and possibly the venue statute are necessary. I suggest we study consolidation closely, with the idea of implementing the concept into our procedural practice. In addition to examining the practice of consolidation, I suggest that we also closely examine the use of Mary Carter agreements in our practice.

I am ready to hold Mary Carter agreements void as against public policy. This court has never directly upheld the validity of Mary Carter agreements. *General Motors Corp. v. Simmons,* 558 S.W.2d 855, 858 (Tex.1977); *Bristol-Myers Co. v. Gonzales,* 561 S.W.2d 801, 804 (Tex.1978). In *General Motors Corp. v. Simmons,* this court reserved the question of the validity of Mary Carter agreements, specifically pointing out that "[t]here is no contention in this case that the settlement agreement was void." 558 S.W.2d at 858. The court then observed that several jurisdictions have held Mary Carter agreements void and that Mary Carter agreements " 'tend to undermine the adversary nature and integrity of the proceedings against the remaining defendant.' " *Id., quoting Reese v. Chicago B & Q R.R. Co.,* 55 Ill.2d 356, 303 N.E.2d 382, 387 (1973).

Mary Carter agreements are a recent phenomenon, not becoming common until the early 1970s. While the majority of jurisdictions have approved Mary Carter agreements, at common law they were prohibited as maintenance and champerty. *Lum v. Stinnett,* 87 Nev. 402, 488 P.2d 347, 350 (1971). As at common-law, Mary Carter agreements should be prohibited because they are inimical to the adversary system, and they do not promote settlement—their primary justification.

In reality, a Mary Carter agreement is only a partial settlement between the plaintiff and one of the defendants in a multiparty lawsuit; the plaintiff still has a lawsuit against the non-settling defendants. Because Mary Carter agreements are not a final resolution among all the parties, they do not preclude, or even discourage, fur-

ther litigation. In fact, a typical Mary Carter agreement requires settling defendants to remain in the case, participate in the trial, and approve settlement offers with remaining defendants.

Indeed, Mary Carter agreements make further litigation more likely. Settling defendants pay plaintiffs more than they would in an ordinary settlement to have a chance to significantly reduce their damages or escape liability completely. Therefore, the remaining defendants must pay enough to cover the plaintiff's expected recovery and the settling defendant's expected reduction for providing the plaintiff with an inflated guarantee. Needless to say, non-settling defendants are going to be reluctant to pay more than their fair share of the damages. "A Mary Carter agreement thus will not encourage settlement of the plaintiff's remaining claim, and litigation is almost inevitable." Comment, *Mary Carter Agreements: Unfair and Unnecessary*, 32 Sw.L.J. 779, 786 (1978).

Even today, the majority acknowledges that Mary Carter agreements are so unfair that they may preclude collateral estoppel from being applied in later lawsuits. The majority wisely holds that a trial court judgment is final for collateral estoppel purposes even though the judgment is on appeal. The majority, then, however, immediately backs away from applying this new rule because in trials where a Mary Carter agreement is present, the jury verdict "is one having the potential of being obtained without full and fair litigation." The absurdity of this situation is obvious. We today adopt a rule designed to promote judicial efficiency and clear the courts of needless relitigation, but we are prevented from reaping the benefits of the rule because of the presence of a Mary Carter agreement.

Mary Carter agreements also threaten the non-settling defendant's due process right to a fair trial. First, settling defendants have an incentive to perjure themselves, since they have a financial interest in the plaintiff's recovery. *Pellet v. Sonotone Corp.*, 26 Cal.2d 705, 160 P.2d 783, 789 (1945) (Traynor, J., dissenting). Second, Mary Carter agreements skew the presentation of the case to the jury. Jurors, unfamiliar with court proceedings, come to court expecting to see a contest between the plaintiff and the defendants, but instead see one of the defendants cooperating with the plaintiff or standing mute. Such cooperation is certainly detrimental to the non-settling defendant. Third, Mary Carter agreements give plaintiffs and settling defendants procedural advantages, the most egregious example being that plaintiffs can lead friendly settling defendants on cross-examination, and *visa versa*.

Mary Carter agreements also distort the deterrent effects of the tort system. Culpable defendants who make a "good deal" can end up paying little or nothing in damages.

While I strongly advocate eliminating Mary Carter agreements for the reasons detailed above, until that occurs they should be fully disclosed to the court and the jury to lessen their inequity. And before Mary Carter agreements can be disclosed, they must be discovered by the non-agreeing parties.

This court has never expressly held Mary Carter agreements discoverable. Clearly, though, they are. In *Simmons*, we held Mary Carter agreements admissible and relevant to show bias and interest of the parties. 558 S.W.2d at 858–59. Unprivileged relevant evidence is discoverable. Tex.R.Civ.P. 166b. Moreover, a Mary Carter agreement entered into after a discovery request should be disclosed pursuant to the duty to supplement discovery under Rule 166b(5)(a)(2).[1]

Mary Carter agreements should be disclosed to the trial court before trial or immediately after the agreement is formed. The trial court must know of Mary Carter

1. Illinois has gone as far as to require parties to a Mary Carter agreement to expose the agreement to the remaining parties and the court, even without a discovery request. *Gatto v. Walgreen Drug Co.*, 61 Ill.2d 513, 337 N.E.2d 23 (1973). Oregon, by statute, requires the claimant who enters into a covenant not to sue or not to enforce judgment with one joint tortfeasor to give notice of the terms to all remaining parties. Ore.Rev.Stat. § 18.455 (1977).

agreements to fairly align the parties and equalize jury strikes. *Greiner v. Zinker,* 573 S.W.2d 884 (Tex.Civ.App.—Beaumont 1978, no writ); *see also City of Houston v. Sam P. Wallace & Co.,* 585 S.W.2d 669, 673–74 (Tex.1979). The court should also consider the Mary Carter alignments in determining whether to let a settling defendant lead the plaintiff's so-called adverse witnesses on cross-examination and *visa versa. See* Comment, *Mary Carter Agreements: Unfair and Unnecessary,* 32 Sw.L.J. 779, 792 (1978).

In addition to the trial court, the jury should also know at the start of trial or immediately upon formation the fact and nature of any Mary Carter agreements. Knowing the settling defendant's financial interest will help the jury to understand the strange alignment of parties and to weigh the plaintiff's and settling defendant's evidence. *City of Houston v. Wallace,* 585 S.W.2d 669.

Moreover, the agreements should not be kept from the jury until the settling defendant begins to help the plaintiff against the non-settling defendant. *Clayton v. Volkswagonwerk,* 606 S.W.2d 15 (Tex.Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). While this court has limited introduction of Mary Carter agreements only to show the true interest and alignment of parties, it has never held the agreements admissible only to impeach after the settling defendant helps the plaintiff's case. *See City of Houston v. Wallace,* 585 S.W.2d 669; *Bristol Meyers,* 561 S.W.2d 801; *Simmons,* 558 S.W.2d 855.

Further, Tex.R.Evid. 408's bias or interest exception to the inadmissibility of settlement agreements is not so limited. Rule 408 allows evidence of settlement agreements to show "bias or prejudice or interest of a witness or a party," without limiting the exception only to impeachment. Unlike its federal counterpart, the Texas rule includes "interest" and "party," and not just "bias," "prejudice," and "witness."

The purpose of this additional language in the Texas rule is to continue the strong judicial policy in Texas favoring the disclosure of Mary Carter agreements.... Because of the possibility of deception arising from such situations, Texas courts allow evidence of such agreements not only to impeach the settling party for bias or prejudice, but also to show directly and substantively the true interests and alignment of the parties.

BLAKELY, *Commentary to Article IV,* 20 HOUS.L.REV. 1 & 2, Texas Rules of Evidence Handbook 242 (1983). The language of Rule 408 indicates an intent to admit Mary Carter agreements before the settling defendant helps the plaintiff's case. Further, we stated in *General Motors v. Simmons* that "[t]he financial interest of the parties and witnesses in the success of a party is a proper subject of disclosure by *direct evidence* or by cross-examination." 558 S.W.2d at 857 (emphasis added). We did not limit disclosure until after the settling defendant helps the plaintiff's case. Under Rule 408 and supreme court cases, evidence of Mary Carter agreements is admissible to show interest of the parties, not just to impeach evidence or arguments already given.

The jury should know of Mary Carters from the beginning of trial for several reasons. The jury can more fairly weigh the agreeing parties' self-serving evidence if it knows in advance of their financial alignment. Perhaps more importantly, early disclosure will enhance the jury's awareness of subtle and covert cooperation. Because agreeing parties are supposedly adverse, they can lead each other's witnesses on cross-examination. By leading questions, the plaintiff can easily elicit testimony from the settling defendant's witness favorable to the plaintiff and settling defendants and harmful to non-agreeing defendants. Could this be called the settling defendant helping the plaintiff's case? In addition, the infinite intangibles *now* known to greatly influence jurors such as the way attorneys treat witnesses and parties can be altered by the agreeing parties to sway the jury in their favor. Only if the jury knows of the parties' alignment from the beginning can it fairly understand the agreeing parties' altered behavior. Disclosure only after one party overtly helps the

other may not overcome the cumulative prejudicial impression of these collusive actions. Even without any cooperation at trial, the jury is entitled to know the parties' true alignment and interest and should not be masked from the reality of a trial skewing conspiracy under the guise of promoting settlement.

Having stated that Mary Carter agreements should be disclosed to the court and jury *ab initio*, the next question is what parts, if not all, of the agreement should be admitted. The jury should know, clearly and explicitly, the agreement's essentials: (1) that the settling defendant will receive credits from the amount he paid or other financial benefits depending on the size of the verdict; (2) the formula by which such financial benefits are calculated; and (3) that the settling defendant is required to participate in trial (if applicable). Beyond these essentials, whether to admit the remainder of the agreement should be left to the judge's discretion under Tex.R.Evid. 403. Rule 403 provides that "if relevant, evidence may be excluded if its probative valve is substantially outweighed by the dangers of unfair prejudice, ... or misleading the jury...." Specifically, the trial judge should exclude the self-serving statements and attacks on non-agreeing parties so prevalent in Mary Carter agreements.

The difficult admissibility question is what to do with the settlement amount. The amount is probative to show the extent of the parties' interest. *See General Motors v. Simmons*, 558 S.W.2d at 857. Disclosing the amount, however, may mislead the jury into thinking the plaintiff is already satisfied or that the settling defendants admitted their liability. The court should apply Rule 403 to the particular facts to determine whether the need to know the full extent of the settling defendant's interest is substantially outweighed by the danger of the prejudice.

Although fully disclosing Mary Carter agreements to juries will ameliorate the unfairness to the non-settling defendants, it is not sufficient. First, it is difficult for jurors, who are not knowledgeable and sophisticated about trial procedure and tactics, to fully grasp the relationship between plaintiffs and settling defendants created by Mary Carter agreements. This is evidenced by the different jury findings obtained in this case and in *Missouri Pacific v. Huebner*, 704 S.W.2d 353 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). Even though these two cases arise from the same accident and their facts are identical, the jury here found Mo-Pac (the Mary Carter defendant) 0% negligent and Scurlock 100% negligent. In *Huebner*, the jury found Mo-Pac (there the non-settling defendant) 90% negligent and Scurlock 10% negligent. Only the Mary Carter agreement can account for these variations in the juries' findings.

Furthermore, even if juries fully understand the relationships created by Mary Carter agreements, they will be prejudiced by both the plaintiff and settling defendant constantly pointing their fingers at the remaining defendant. Disclosing Mary Carter agreements also does not take away the settling defendants' incentive to perjure themselves.

Lastly, the disclosure of Mary Carter agreements by itself may prejudice the jury. *Lum v. Stinnett*, 488 P.2d at 353. It is argued that disclosure harms non-settling defendants because they look unreasonable to the jury for not settling as the other defendant has done. Comment, *Mary Carter in Arkansas: Settlements, Secret Agreements, and Some Serious Problems*, 36 ARK.L.REV. 570, 582 (1983). It is conversely argued though that disclosure hurts the plaintiff because the jury thinks that the plaintiff has received full satisfaction from the Mary Carter agreement for his injuries, or that the responsible party has already come forward. Comment, *Mary Carter Agreements: Unfair and Unnecessary*, *supra*, at 796. Whomever is prejudiced, the non-settling defendant and society are entitled to a fair trial "without hazarding the prospect that such considerations might affect the jury's verdict." *Lum v. Stinnett*, 488 P.2d at 353.

In conclusion, Mary Carter agreements are a threat to the integrity of our adver-

sarial system and do not promote settlements. Mary Carter agreements do provide attorneys with a skilled litigation tool for tactical gamesmanship, but the judicial system is not a game. It is society's way of *fairly* resolving disputes.

GONZALEZ, J., joins in this concurring opinion.

McGEE, Justice, concurring.

I concur in the court's opinion but only write in an attempt to clear up the Mary Carter admissibility quagmire.

As the court recognizes, *General Motors Corporation v. Simmons*, 558 S.W.2d 855, 858–859 (Tex.1977), permits disclosure of a Mary Carter agreement to impeach a settling party's financial interest in the plaintiff's case. However, a party's financial interest under a Mary Carter agreement never becomes an issue at trial unless a settling party does something to help the plaintiff recover. *Clayton v. Volkswagenwerk*, 606 S.W.2d 15, 19 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). Only then is the Mary Carter's admissibility invoked and only then can the non-settling party reveal its existence to the jury and introduce portions of the agreement to impeach a settling party. The non-settling defendant cannot hint of the existence of a Mary Carter agreement at voir dire or at any other time until a party to the agreement invokes its admissibility. *Id.* at 17. *Cf. Brown v. Gonzales*, 653 S.W.2d 854, 864 (Tex.App.—San Antonio 1983, no writ) (plaintiff opened the door to admissibility of the Mary Carter agreement at voir dire). Neither may a non-settling defendant call a settling party adversely in an effort to offer a Mary Carter agreement into evidence just so he can impeach the settling party with the agreement. *Clayton*, 606 S.W.2d at 18; *Republic National Life Ins. Co. v. Heyward*, 568 S.W.2d 879, 885 (Tex. Civ.App.—Eastland 1978, writ ref'd n.r.e.). Therefore, the test for admissibility of a Mary Carter agreement in Texas is two-pronged: (1) the settling defendant has a financial interest in the plaintiff's recovery, and (2) the settling defendant, his counsel, or his witnesses assist the plaintiff's recovery.

Once the admissibility test is met, a non-settling defendant may impeach a settling party by revealing the existence of a Mary Carter agreement and actually introducing portions of the agreement into evidence. But, before the contents of the agreement are revealed to the jury, the trial court must delete those portions that are hearsay, prejudicial, and purport to resolve the issues of liability and damages clearly within the province of the jury. *Brown v. Gonzales*, 653 S.W.2d 854, 864 (Tex.App.—San Antonio 1983, no writ). *See also Danaho Refining Co. v. Pan American Petroleum Corp.*, 383 S.W.2d 941, 946 (Tex.Civ. App.—Waco 1964, writ ref'd n.r.e.) (deduction, speculation, inference or surmise of a witness about the proximate cause of an accident is properly excluded when the jury may draw the inference). *Cf. McAllen Kentucky Fried Chicken No. 1 v. Leal*, 627 S.W.2d 480, 484 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.) (interpreted in *Brown v. Gonzalez* to hold that the entire Mary Carter agreement as altered by deletions is admissible into evidence).

Another question arising in this case is whether the guaranty amount of the Mary Carter agreement may be disclosed to the jury. The policy behind the disclosure of Mary Carter agreements is to reveal to the jury the collusive relationship between the settling parties. Disclosure of the guaranty amount goes beyond that policy; it gives the appearance that liability has been admitted by the settling party and plaintiff has already been partially or fully compensated. The guaranty amount should be excluded by the rule that settlement agreements are not admissible to prove liability. Tex.R.Evid. 408. *Accord City of Houston v. Sam P. Wallace & Co.*, 585 S.W.2d 669, 673 (Tex.1979). In addition, a rule sanctioning disclosure of the guaranty amount frustrates the policy favoring the settlement of lawsuits. *McGuire v. Commercial Union Insurance Co. of New York*, 431 S.W.2d 347, 352 (Tex.1968); *Simmons*, 558 S.W.2d at 857.