**TEXAS BEEF CATTLE COMPANY, et al, Appellants,**

v.

**Jeff GREEN, Individually and d/b/a J & F Cattle Company, Appellee.**

No. 09–93–013 CV.

Court of Appeals of Texas, Beaumont.

Sept. 1, 1994.

Rehearing Overruled Sept. 22, 1994.

See also, 862 S.W.2d 812.

David J. Fisher, Orgain, Bell & Tucker, Beaumont, for appellant.

James G. Gumbert, Mike Johnston, Bill Daniel, Sullins, Johnston, Rohrback, Magers & Herbert, Houston, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

Appellee, Jeff Green (Green), brought suit against appellants, Texas Beef Cattle Company (Texas Beef) and W.H. (Bill) O'Brien (O'Brien), alleging an actionable tortious interference with contract and also pleading a cause of action for malicious prosecution. Texas Beef is a general partnership made up of a number of general partners. O'Brien is described as the managing partner of the general partnership. All the members or partners of Texas Beef are general partners.

### *The Bedrock Basic Questions*

In a juried proceeding, the jury found in favor of Green. In answers to Question 1, the fact finders found that Texas Beef and O'Brien tortiously interfered with a contract between Green and Cargill Agricultural Credit Corporation (Cargill) and that the tortious interference was a proximate cause of damages to Green. The jury in separate answers found that Texas Beef had tortiously interfered causing damages to Green and, in addition, that O'Brien had tortiously interfered causing damages to Green. Question 1, inquiring about tortious interference was, we hold, correctly submitted with proper instructions.

In response to a separate jury question (Question 2), the jury found that Texas Beef and O'Brien were privileged to interfere with the contractual relationship between Green and Cargill. However, that interference was done with malice by O'Brien. The jury found no malice against Texas Beef. The failing to find malice as against Texas Beef is not controlling as to O'Brien personally who was the managing partner. O'Brien was not absolved. Malice was defined to include ill will, spite, evil motives, and purposely injuring another, being Green.

The jury also found that Texas Beef and O'Brien maliciously prosecuted the Hartley County suit against Green by pursuing, originating, and instigating litigation in Hartley County and that this malicious prosecution proximately caused damages to Green. Question 4 inquired about malicious prosecu-

tion. We conclude Question 4 was correctly submitted with correct instructions. The jury found for Green on the termination element of the malicious prosecution case.

The Liberty County jury, in the case sub judice, on the damage issues did not favor Green as to every element of damage submitted. The jury below found no damages for mental anguish but the jury found that Green had been damaged in his business and personal reputation and that Green had been damaged by having to pay reasonable and necessary attorneys' fees and costs in the past in connection with the Hartley County litigation as well as reasonable and necessary attorneys' fees and costs in the future in connection with the Hartley County litigation. The jury awarded a sizable sum as exemplary damages against O'Brien. No exemplary damages were affixed against Texas Beef by the jury.

### The First Liberty County Case

To understand the posture of this appeal, it is noted that these parties have been previously before us. A prior, full-dress first Liberty County case was tried. The first jury returned a detailed verdict of over 30 issues. The pleadings of these same parties in the first case and the issues determined therein by the first jury control, to a significant degree, the points of error in this subsequent appeal. Green prevailed in the first Liberty County case. We affirmed in an unpublished opinion. The Supreme Court denied the application for a writ of error filed by the appellants in the first case. The first case determined the issues, inter alia, of titles to cattle and issues deciding the payment of debts and other liabilities.

### Appellants' Primary Position

The defendants/appellants now attack the judgment through a number of points of error. In basic terms the appellants argue that no judgment can be based upon the malicious prosecution theory because Green failed to prove the required elements of a malicious prosecution cause of action. In separate points of error, the appellants state that the trial judge improperly disregarded the jury finding on privilege which was alleg-

edly a complete affirmative defense for the defendants in the cause of action based on tortious interference of contract. Appellee counters that the finding of malice as defined destroyed the defense of privilege.

The oral submissions were very helpful and the briefs clearly demonstrate a high degree of professionalism.

The appellants bring 21 points of error. Many of them are grouped. This opinion will attempt to write upon the same as grouped.

### Appellants' Attack on the Tortious Interference Questions

The main thrust of the appellants' first group of challenges is that since the jury found that Texas Beef and O'Brien were privileged to interfere with a contractual relationship between Green and Cargill, then no recovery can be based on the theory of tortious interference with a contract. Appellee rebuts appellants' position by stating that since O'Brien acted with malice as defined in Question 3 that the privilege was destroyed. The privilege was a qualified one.

Following the trial on the merits to the jury, the able presiding judge disregarded the jury's finding that Texas Beef and its managing partner O'Brien were privileged to interfere with the contractual relationship between Green and Cargill because there was no legally sufficient evidence to support that finding and because under the entire verdict that finding of privilege (being a qualified one) became ineffectual. The finding of malice as submitted to the jury destroyed any privilege.

The trial judge in the case at bar entered judgment against Texas Beef in favor of Green for the actual damages, being $175,000 plus pre-judgment interest, post-judgment interest, and court cost. The exemplary damages award of $500,000 was set against the managing partner, O'Brien.

### Appellee's Position on the Defense of Privilege and on the Issue of Malice and the Factual and Procedural Background Thereof

Appellee argues that the trial court properly disregarded the jury's answer to Ques-

tion 2 dealing with privilege because such privilege only protects good faith acts and valid assertions of legal rights. We agree under this unique record.

Of paramount importance are the background and the previous litigation between and among the parties. The first Liberty County trial was conducted in April and May of 1989. This previous litigation proceeded to final judgment. Appellee argues several following theories and contentions. Appellee maintains appellants were barred by the doctrines of *res judicata* as well as collateral estoppel from bringing their Hartley County litigation. Also, the appellants violated the compulsory counterclaim rule.

At the core of these multiple lawsuits and appeals lies the question, ownership, and status of 247 head of cattle as well as much larger numbers of cattle of different genders. The 247 head were steers. The other groups of cattle included heifers and cows. Texas Beef at the time of the various litigations was and apparently still is a Texas general partnership in the continuing business of buying, feeding, and selling cattle. O'Brien was, at all relevant times, the managing partner of Texas Beef. Green is an individual engaged in the business of buying cattle for others and of collecting the cattle and reselling the same. This appeal involves the third lawsuit between Green and Texas Beef and O'Brien.

The record reflects that Green had gathered actually about 253 head of cattle that were repetitiously described in the statement of facts as being 247 head of steers. Green was a bonded order buyer of cattle. Green had met one Doug Florence who was in the cattle business in the Panhandle area of Texas. Doug operated the Los Ninos Ranch which was near Dalhart, Texas, northwest of Amarillo. Doug Florence also leased a large ranch known as the Beck Ranch. The Beck Ranch was east of Dalhart.

The record reflects that O'Brien had come to Hardin, Texas, to look over the facilities of Green near Daisetta and Hull. Green had several cow pens at or near his house in Hardin. In the pens Green had backbranded cattle and he stocked cattle. Green would buy cattle and bring them to his pens and then ship them out to buyers. Green stocked cattle rather than actually pasture the cattle. Green dealt principally in cross breed cattle because the record shows that when doing business in the Panhandle that a bonded order buyer could not sell cattle with over ⅛ or ¼ Brahman blood in the cattle. The rest of the blood line had to be of an English breed. This requirement was necessitated by the cold winters and other factors in the Panhandle. Doug Florence and O'Brien had a going partnership or a joint venture partnership in cattle.

Green had already fully paid for the 247 steers. Green's cost was about $98,000 or $99,000. The 247 head had been gathered by Green from El Campo, Warton, Sealy, and other towns in Texas. Some of the 247 came out of Louisiana. Green paid for the cattle with borrowed money. He had a line of credit with First State Bank in Hull. Doug Florence told Green to ship the 247 steers to the Beck Ranch.

After the 247 arrived at the Beck Ranch no one paid Green for them. The 247 were kept separated from all other cattle on the Beck Ranch. Green had previously delivered many head of various types of cattle before the 247 arrived. The earlier cattle included heifers, cows and different steers. Green explained that he needed his money quickly for the 247 steers. The 247 were offered to O'Brien and Texas Beef. O'Brien stated that the price was too high. Green planned to pick up the 247 and transport them to a sale barn. Green needed to sell the 247 in order to pay his large debt to the Hull bank. The 247 were on the Beck Ranch and stayed on the Beck Ranch for approximately a week. They were not bought by Texas Beef or O'Brien. Texas Beef and O'Brien unequivocally refused to buy the 247. Green had to have his money or his 247 steers back.

Green had to concern himself with his large debt at the First State Bank in Hull. Green in about the middle of December of 1988 went to Amarillo to meet with Doug and O'Brien to get payment for cattle that he delivered earlier other than the 247 and also to make arrangements to take back his 247 head of steers to Hardin or elsewhere. Green had delivered many head before the

247. Green had not received payment for the cattle delivered before the 247. Green after the meeting received no money for any of the cattle. The 247 were definitely rejected by Texas Beef and O'Brien.

Doug Florence had a personal, individual line of credit at Cargill. After the 247 were rejected, Doug called Cargill. At Doug's personal instance and request a draft from Cargill was made out. The draft related strictly to the 247 head and the dollar amount was $102,853.65. Green only broke even. Doug Florence had arranged for the draft with Cargill through a Mr. McMurtry. The draft contained and required Green to execute a bill of sale as well as a full, general warranty of title to the 247 steers to the benefit of Cargill.

Simultaneously, Green actually informed O'Brien in person that the 247 were being shipped from the Beck Ranch to Caprock Yard IV. Also, Green told O'Brien that Cargill was paying in full for the 247. O'Brien had no objection since he had definitely declined to purchase the cattle because O'Brien insisted that the price was too high.

The conclusion reached by our Ninth Court is that the arrangements concerning the 247 head of cattle constituted a separate transaction and a separate, distinct contract from those of any other group of cattle and O'Brien acknowledged and realized this situation. Plaintiff's Exhibit 2 came into evidence without objection. Plaintiff's Exhibit 2 contained a bill of sale and the bill of sale contained, as an integral part thereof, a general warranty that the seller Green agreed to defend the title of the said 247 livestock against any person whomsoever and Green warranted and certified to the buyer and Cargill that there were no liens or security devices or security interest on file or financial statements on or with respect to the 247. Green had good title to the 247 head of cattle. He had paid for them in full. After receiving the money from Cargill, Green promptly paid off his loan at the Hull bank. This loan had been made on the draw on the 247 head. Neither the bank at Hull nor anyone else had made any complaint whatsoever about Green's paying off the loan.

We conclude that the record plainly shows that O'Brien and Texas Beef had no claim to the 247 head and the first jury so held. O'Brien had unequivocally declined to purchase the 247 head of cattle or any part thereof. Green had every right to try to minimize his losses and after O'Brien and Texas Beef had totally rejected the 247 head of cattle, Green legitimately sold them. The sale of the 247 head by Green in no manner caused any loss to Texas Beef or O'Brien. Green had a legal duty to minimize his losses and damages after O'Brien had refused to buy. Florence, a joint venturer or partner to Texas Beef and O'Brien had instructed Green to send the 247 to Beck Ranch. Green had a duty to pay the Hull bank.

Nevertheless, within some number of days after the Cargill transaction, O'Brien received information and learned that there were a smaller number of cattle on the Beck Ranch than he thought was necessary to cover the number of different cattle that Texas Beef believed that Florence was caring for at the Beck Ranch on Texas Beef's behalf. Under this record, Green had nothing to do with this shortage. *Florence had confessed to stealing Texas Beef's cattle.* Later it became apparent that Doug Florence had wrongfully taken some of Texas Beef's money with which he had claimed to use to purchase cattle on behalf of Texas Beef, but he had not done so. The cattle were nonexistent. But again the 247 head of cattle were not involved in this shortage top, side nor bottom.

The appellants state in their brief that Doug Florence confessed and caused an eruption. This eruption in the cattle industry hit the Texas Panhandle around Christmas of 1988. Doug Florence confessed to stealing cattle from Texas Beef. The fact finders have consistently failed to find any culpable or off-color relationship between Green and Doug Florence. The monies that Green received for the 247 head of cattle were not monies from Texas Beef. These monies derived strictly, directly, and straight from Cargill.

Indeed, the appellants, we conclude, concede that Green was unpaid for several large shipments of cattle separate and apart from

the 247 because Florence's drafts and checks had been dishonored and because Florence in some instances had simply failed to pay for the other stock. Cargill was not in the business of buying and selling cattle. McMurtry, a manager or employee with Cargill, made it clear that he and Cargill intended merely to lend money to Florence and that Cargill treated the advance of money as a loan to Florence—not to anyone else. Florence, the appellants admit, had already received approval of a $200,000 personal line of credit with Cargill. Florence was the actor who took the 247 head from the Beck Ranch to the Caprock Feed Yard IV where they were checked in under Florence's name as the owner.

Toward the very end of December of 1988, O'Brien called McMurtry and told him of the so-called Florence confession which had resulted in a horrendous eruption in the Texas Panhandle cattle market. O'Brien then claimed that Texas Beef had some nature of claim on some of the cattle in the Caprock Feed Yards that were standing in the name of Florence.

Then, Cargill relocated the 247 head of cattle to another yard known as the Dalhart Sales Yard for auction to protect their security interest. O'Brien was protesting against Doug and Cargill, not Green. The 247 head of cattle which were in the name of Florence or in the name of Los Ninos Ranch were then sold at auction.

Texas Beef was untimely and belatedly attempting to claim ownership in the 247 or some right of possession therein. The Dalhart Livestock Auction placed the $102,000 which were the sales proceeds from the 247 head of cattle into the registry of the district court for Hartley County. Green played no part in these subsequent actions concerning the money placed in the registry. The actions taken subsequent to Green's receiving the Cargill draft were those of Texas Beef and O'Brien concerning the 247. The record plainly shows that O'Brien was told of the draft instrument between Green and Cargill. O'Brien had no objection.

In late December, 1988, Texas Beef filed an injunction suit in Hartley County District Court, cause no. 3269, against the Los Ninos Cattle Company (the company owned by Doug Florence), Bill Bass, and Perry White to enjoin the removal of other cattle claimed by Bass and White from the Beck Ranch. Later in January of 1989, Texas Beef filed a supplemental petition against Cargill because of the Dalhart Livestock Auction incidents. Then in mid-January of 1989, Texas Beef filed another pleading against Louis Dreyfus Corporation, Seckler Company, Doug Florence, and Jeff Green. It was evident in the record that Florence's financial situation and business transactions created a lot of problems and disputes among many parties. The record fails to show that Green played any part in Florence's wrongful acts leading to Florence's confession.

Appellants concede that Texas Beef added Green because he was asserting a claim to cattle somewhere in the possession of Texas Beef. Indeed, Green had never been paid for many head of cattle separate and apart from the 247 head. But these claims of Green did not include or cover any of the 247 head of steers. Cargill had fully paid Green on the 247.

Before Green was ever named or brought into the Hartley County litigation, he (Green) filed suit in Liberty County against Doug Florence and Texas Beef and O'Brien to seek payments for various lots of cattle which he had actually delivered to Florence which Florence had apparently resold to Texas Beef. But Green had not been paid with good checks or money. These accounts owing to Green were large. Florence had passed to Green bad checks marked insufficient funds. One bad check was also marked—do not present this check again. The checks remained bad.

### The Results of the First Liberty County Case

In Green's suit in Liberty County he alleged various agency relationships and partnership relationships and theories to assess debt liability against Texas Beef and its partners. Green in his first Liberty County suit prevailed in his claims for payment and the jury failed to find in Texas Beef's favor on Texas Beef's counterclaim for conversion by

Green of the 247 head of cattle and on the theory of negligent grazing. In the first trial in Liberty County, Green won and Texas Beef and O'Brien lost.

### The Jury Findings in the First Trial of April and May of 1989

It is important to note at this juncture that in the first Liberty County case the jury, among other findings, found that Texas Beef entered into either a joint venture or partnership with Doug Florence and that Texas Beef was estopped to deny that it had entered into a partnership or joint venture with Florence d/b/a Los Ninos Cattle Company, and the jury found that O'Brien and Texas Beef had ratified the agreements by Florence to purchase Green's cattle.

And in answer to jury Question 11 in the first trial, the jury found that Doug Florence had made an agreement to purchase large numbers and groups of cattle from Green on behalf of both O'Brien and Texas Beef and those lots included, among other lots, lots numbered 140, 141, 143, 144, 145, 146, 147, 148, 149, 152 and 154.

Now, bear in mind that in the first Liberty County case that the parties put in issue questions concerning the sale of all of these cattle, the contracts involving all of these cattle, the breach of the contracts, and the damages to Green, found to be in excess of a quarter of a million dollars. The first jury awarded $258,658.80 damages to Green. This $258,658.80 award was for the unpaid price of cattle other than the 247.

*And very importantly, the jury in the first Liberty County case found that Texas Beef failed to pay Doug Florence* for all the cattle in question in the suit and that Green did not authorize Florence to accept payment for Green from Texas Beef for the cattle involved.

The jury also found that Green was not negligent and that Green's actions did not proximately cause Green's own loss from the failure of Florence to pay for the cattle received from Green.

Very significantly, the jury found that on or about December 19, 1988, that Texas Beef was not the owner of the 247 head and that Texas Beef did not have possession of nor the right of possession to the 247 head located at the Beck Ranch and shipped to Caprock Feed Yard IV and that the fair market value of the 247 head of cattle on December 19, 1988, amounted to $102,853.65. By irrefutable logic, the award to Green of $258,658.80 was for cattle of numerous groups other than the 247. Very interestingly, the jury also found in the first Liberty County trial that Jeff Green agreed with Texas Beef to properly care for cattle identified as Lot 88529, being 446 heifers; Lot 88528, being 544 steers; and Lot 88580, being 811 heifers, located on the Chester Honey pasture and that Jeff Green did not negligently fail to take care of all these cattle, being the heifers and steers in the three numbered lots.

The jury found that O'Brien and Texas Beef ratified even the unauthorized agreements to purchase cattle entered into by Florence. The number of groups of cattle were not limited in this special question. A number of jury questions, by their wording, make plain that the first Liberty County case involved very numerous cattle and groups of cattle and that all of these cattle were put into issue. Cogently, the pleadings of the parties discussed below also placed these numerous cattle in issue.

In our view jury questions and the live pleadings in the May 1989 Liberty County trial were relevant and very similar to, if not identical to, the issues, contentions, and pleadings filed later in Hartley County against Green by Texas Beef and O'Brien. In our view the pleadings and issues raised against Green in Hartley County were compulsory counterclaims under TEX.R.CIV.P. 97. Rule 97 provides in relevant part:

(a) **Compulsory Counterclaims.** A pleading shall state as a counterclaim any claim within the jurisdiction of the court, not the subject of a pending action, which at the time of filing the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction; . . . .

But here, the defendants joined these compulsory counterclaims by their own pleadings. Hence, Green's position on compulsory counterclaims is correct on a two-fold basis.

### The Privilege, If Any, was Eviscerated

It is interesting to note that after the trial in Hartley County wherein Texas Beef and O'Brien lost on all jury questions, in the district court, then an appeal was taken to the Amarillo Court of Appeals. In an excellent opinion, the Amarillo Court agreed with Green's position that the doctrines of *res judicata* and collateral estoppel barred any of Texas Beef's or O'Brien's claims as to the 247 head of steers which the Amarillo court described as Group B. *See Texas Beef Cattle Co. v. Green*, 860 S.W.2d 722 (Tex.App.—Amarillo 1993, writ denied).

The Amarillo Court of Appeals fully and unequivocally affirmed the trial court's take-nothing judgment against Texas Beef and O'Brien (our appellants here) with respect to the 247 steers and our Ninth Court finds that the claims in that proceeding initiated in Hartley County by appellants involved the same issues as to the self-same 247 head. The jury, in the record of this appeal, found that the appellants' prosecution in Hartley County concerning the 247 head was a malicious prosecution. We agree. We hold in this aspect that the second Liberty County jury was sustained by more than ample evidence in finding malicious prosecution. We hold that the final judgment entered in the first Liberty County case was strong evidence of probative force that the underlying suit had terminated in Green's favor and that the appellants had simply failed to acknowledge that the judgment of May 20, 1989, was the final judgment.

The Liberty County trial court signed its final judgment on May 20, 1989, in Cause no. 43,469, and Texas Beef and O'Brien began the appellate process to the Beaumont Court of Appeals. This Court affirmed the trial court on January 17, 1991. The Texas Supreme Court denied writ and overruled the motion for rehearing on September 5, 1991.

After the 1989 trial in the district court of Liberty County in which Green prevailed and Texas Beef and O'Brien lost and after the final judgment was entered (the appellants seemingly concede that it was a final judgment in their brief), then Green's attorney properly and helpfully sent a letter to Texas Beef's attorney in Amarillo and asked Texas Beef and their attorney to abate all claims made against Green while the first Liberty District Court case was on appeal.

The attorney for Texas Beef declined. Even after the case was on appeal to the Beaumont Court of Appeals, Texas Beef continued to press its suit in Hartley County. The letter proved notice and knowledge to appellants that the May 1989 judgment was final for tortious interference of contract purposes. Appellants described the May 20, 1989 judgment as a final one in their brief more than once. Since appellants failed to heed the *Scurlock Oil Co.*[1] rule and the notice letter, their complaint about the lack of a final judgment was destroyed. The critical letter of notice, requesting abatement, will be dealt with below.

### The Letter

By letter to the attorney for Texas Beef and O'Brien, Hon. Mike Johnston on May 30, 1989, pointed out that under the principles of *res judicata* and collateral estoppel the judgment obtained by Green in the Liberty County District Court had precluded the claims or issues in the suit pending in Hartley County. We quote from the notice letter:

> The Supreme Court has ruled specifically in *Scurlock Oil Company v. Smithwick*, 724 S.W.2d 1 (Tex.1986), that a judgment is final for purposes of issue and claim preclusion despite the appeal of a judgment.

The last paragraph of the letter asks for an agreement to enter an order abating the Hartley County suit until the appellate steps had been concluded. Texas Beef declined. We quote from *Scurlock Oil:*

> In this age of complex litigation, with multiple suits often arising from one occurrence, it ordinarily makes no sense to relit-

---

1. *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1 (Tex.1986).

igate the same issues between the same parties, with the possibility of inconsistent results. Once litigated in a fair forum, that result should be binding.... Moreover, the waste of judicial time in relitigating already decided issues is apparent. Our trial courts are already overburdened with cases requiring initial determination without having to also retry questions already decided. Therefore, we now adopt the rule of the *Restatement (Second) of Judgments* § 13, and hold that a judgment is final for the purposes of issue and claim preclusion "despite the taking of an appeal unless what is called an appeal actually consists of a trial de novo."

The doctrine of *res judicata* and the doctrine of collateral estoppel have been equated to claim preclusion and issue preclusion and preclusion by judgment. This appeal before us is manifestly not a trial de novo. We are constrained, therefore, to hold that the judgment of the Liberty County court was when entered and under the Supreme Court's ruling a final judgment. Thus the appellants' defense of lack of finality in the tortious interference case is exploded. Hence, the argument of the appellants that the judgment was not final is not sound.

In any event because of the Amarillo Court of Appeals opinion, certainly no harm was visited upon the appellants. We observe that the Amarillo court with respect to the 247 head of cattle has taken the position that the issues in respect thereto had been terminated in Green's favor. The Supreme Court declined a writ. Therefore, even if there were any error in the trial judge's decision in this second Liberty County case based on the alleged lack of termination, that decision was harmless. But we reiterate, we do not find error.

We note the termination issue was properly determined below and affirmed by the Court of Appeals sitting in Amarillo. For the reasons stated above, we determine that the appellants in this appeal, sub judice, did not have legal or lawful justification which was a necessary prerequisite to their asserted privilege. Justice Carlton B. Dodson, writing for the Court stated:

In response to Texas Beef's causes of action, in Hartley County, Green plead res judicata and collateral estoppel by virtue of a judgment rendered on 20 May 1988 [sic] by the 253rd District Court of Liberty County, Texas in cause number 43,469.... However, Texas Beef filed a counterclaim in the Liberty County suit for conversion of the 247 head of cattle (*i.e.*, the Group B cattle) which were a part of the subject matter of the Hartley County suit.

In the Hartley County action, the trial court ordered a separate trial on Green's defense issues of res judicata and collateral estoppel. Those issues were tried to a jury, and the trial court concluded that the jury verdict was against Texas Beef. *After the judgment in the Liberty County suit was affirmed on appeal, the trial court rendered judgment in the Hartley County suit in favor of Green and denied Texas Beef's claims as to the Group A cattle and the Group B cattle.* (Emphasis added)

And furthermore, as is shown by the record in the first Liberty County case, virtually every one of the paragraphs and allegations of the appellants' pleadings that they later initiated against Green in Hartley County were compulsory counterclaims. Appellants' pleadings in Liberty County were in substance the same as those filed in Hartley County.

We feel constrained to point out also that we have deep respect for the excellent ability and scholarship of the jurists on the Amarillo court. But we must observe that their excellent opinion does not discuss the doctrine of compulsory counterclaims. In addition, we have compared the pleadings initiated by the appellants in Hartley County against Green with their pleadings in the first Liberty County case and we find that they are virtually the same and for all practical purposes identical.

The prior pleadings in Liberty County and the later pleadings in Hartley County were entered into evidence without objection.

Appellants pleaded a cause of action against Jeff Green for grazing losses. The pleadings filed in Liberty County and those

that were later filed in Hartley County on negligent grazing were identical.

There were pleadings and paragraphs bearing the caption "Action for Wrongful Sequestration" filed against Green by Texas Beef and O'Brien. One wrongful sequestration claim made in the Liberty case and the same "Action for Wrongful Sequestration" later filed in the Hartley County suit—were identical as to wordings and even punctuation. We hold that that is enough to implicate the rule on compulsory counterclaims under Rule 97 and, therefore, the appellants in this trial at bar simply had no defense of legal justification. The multiple terminations of all issues on the 247 head destroyed conclusively any legal justification in this appeal sub judice. Thus, this malicious prosecution defense fails.

But appellants argue vehemently and rely upon *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686 (Tex.1989). Appellants maintain that the *Sterner* case completely establishes their defense of privilege regardless of the jury's finding of malice. We disagree. We quote from Justice Doggett:

> Many of our sister states hold that a claim of legal justification or excuse in the interference of contractual relations is an affirmative defense upon which the *defendant has the burden of proof.* [citations omitted] This is because legal justification or excuse is treated as a type of privilege. *The party asserting this privilege does not deny the interference but rather seeks to avoid liability based upon a claimed interest that is being impaired or destroyed by the plaintiff's contract.* Such defenses, which constitute a confession and avoidance, are affirmative in nature. Tex. R.Civ.P. 94. Therefore, we conclude that the privilege of legal justification or excuse in the interference of contractual relations is an affirmative defense upon which the defendant has the burden of proof.
>
> . . . .
>
> Under the defense of legal justification or excuse, one is privileged to interfere with another's contract (1) *if it is done in a bona fide exercise of his own rights,* or (2) if he has an equal or superior right in

the subject matter to that of the other party. (Emphasis added)

We hold under this record that appellants failed to exercise their claimed rights, if any, in a bona fide manner. Malice, ill will, spite, evil motives, purposely injuring another (Green) disemboweled any bona fide exercises. In both Liberty County and Hartley County the jury found that both Texas Beef and O'Brien had no equal or superior right to the 247 head to the rights of Green. Appellants' confidence in *Sterner* is misplaced. Again, on this additional ground, legal justification is non-existent.

We sanguinely overrule appellants' points of error one, two, and three attacking Green's recovery based on tortious interference with contract.

### Appellants' Complaint Against the Instruction on Contract

■ Appellants' point of error four objects to an instruction contained in Question 1 alleging a comment on the weight of the evidence. The challenged instruction reads:

> You are instructed that Jeff Green had a contract with Cargill Agricultural Credit Corporation whereby Green was obligated to defend the title to the 247 head of cattle against claims made by others.

Plainly, the above is an instruction of law; it is not a comment on the weight of the evidence. We deem it correct. The instruction is practicable and proper under Tex. R.Civ.P. 277. Rule 277 in substance mandates that the trial court *shall* submit such instructions and definitions as shall be proper to enable the jury to render a verdict. This same Rule 277 mandates that the trial court *shall* submit the cause upon broadform questions. Trial courts routinely give instructions and definitions to the jury on law such as those on proximate cause, negligence, producing cause and others.

To show error in relationship to the court's charge, appellants must prove an abuse of discretion. *Texas Dept. of Human Services v. E.B.,* 802 S.W.2d 647 (Tex.1990). In this governing case Justice Cook held that Rule 277 meant what it said. The recent amendments to Rule 277 required broad-form sub-

mission and a trial court must submit such broad-form questions. Abuse of discretion occurs only when the trial court acts without reference to any guiding principle. Rule 277 with its provisions for instructions and definitions expedites trials by simplifying the charge conference and making the questions easier for the jury to understand, comprehend, and answer.

In this case there was no dispute as to the valid and enforceable contract between Green and Cargill. Green was duty bound to defend by a general warranty the title to all of the 247 head. Green had to defend the $102,800 plus monies he received from Cargill to vouchsafe his payments to the Hull bank. The instrument specifically described the 247 steers being Lots 4984 and 4985 at Caprock IV. Green had to defend his given purchase money security interest and his authorization to Cargill to take full possession of the steers.

Green's general warranty was very extensive. It included a certificate that there were no liens, mortgages, or security interests or filed financial statements with respect to the described livestock. We find no error. But if there was a mistake, it was invited. Also, appellants have completely failed to show that such instructions were reasonably calculated to cause and probably did cause the rendition of an improper judgment. TEX. R.APP.P. 81(b)(1). We overrule appellants' point of error four. Having overruled all the challenges and points of error of appellants that attack the theory of recovery based on tortious interference of contract, we affirm the judgment.

The judgment below in this case has as an independent, separate, solid ground of affirmance, Green's cause of action for tortious interference of contract.

### The Malicious Prosecution Case

■ Appellants' points of error numbers five, six and seven argue that the trial court erred in overruling the defendants' motion for judgment n.o.v. and the objections to the charge and the motion for new trial because appellants say there was legally insufficient evidence and, in the alternative, factually insufficient evidence to support a recovery based on malicious prosecution. The whole thrust of appellants' argument is that Green failed to prove his case because he failed to show that the defendants in the malicious prosecution case caused the original, offending, underlying suit to be filed and, secondly, he failed to show the termination of the original suit in favor of the party prosecuting a later malicious prosecution action and legal damages resulting therefrom. We disagree. The appellants brought the suit in Hartley County. The judgment of the first Liberty County suit was a final judgment in favor of Green and damages were amply shown. These facts acted as a first termination, being affirmed at all levels.

The final judgment in Hartley County acted as a termination of the suit in Green's favor. Green's suit for malicious prosecution was not premature or untimely. Any argument about termination is laid to rest by the Amarillo court and the Supreme Court. No harm is shown by appellants. The rulings on termination were not a denial of appellants' rights. The ruling did not cause the rendition of an improper judgment.

The record, history, and posture of this instant appeal before us is unique. We have been unable to find a similar reported case. Here the first Liberty County verdict and judgment were affirmed in the Ninth Court, an application for writ denied in the Supreme Court, constituting an exhaustion of all remedies and being a thrice-final judgment and a three-fold termination. This finality and termination concluded all issues, claims, pleaded counterclaims and compulsory counterclaims presented in the first Liberty County suit are germane thereto.

Unquestionably, as to the 247 head there was a final judgment entered in Hartley County, affirmed in the Amarillo Court. Again, the Supreme Court denied a writ. These final decrees constitute a three-fold termination of all of the issues involving the 247 steers. Thus, we hold that the element of termination in Green's malicious prosecution case has been conclusively proved. Accordingly, the malicious prosecution case is solidly based on Green's favorable findings in two district courts, by two different juries, in

two Courts of Appeals, and in a very realistic sense, the Supreme Court.

Now, at this date, we are not called upon to pass upon whether the element of termination was satisfied by Green. We have no obligation to further test this termination pursuant to TEX.R.APP.P. 81(b)(1). There is no question of "reasonably calculated to cause and probably did cause a rendition of an improper judgment" because all of the prior judgments on this issues are now "graveyard dead" without hope of resurrection. Appellants' complaint about the lack of termination is overruled. Appellants' point of error six is overruled.

The record makes clear that the defendants-appellants here in this malicious prosecution case caused the original, underlying, offending suit to be filed in Hartley County. The documents and pleadings in evidence sustain this proposition. Appellants' point of error five is overruled.

Appellants cite and rely upon *Kale v. Palmer*, 791 S.W.2d 628 (Tex.App.—Beaumont 1990, writ denied). *Kale* is inapposite.

We sanguinely determine that our case in this appeal is dramatically and meaningfully different from *Kale v. Palmer, supra*. Appellants rely on *Kale* to support their contention that the termination of the original suit in favor of the party prosecuting a later malicious prosecution action must be shown. The facts here are entirely different. The holding of our Court was that only if Kale proved that the aspiration testimony was false could the appellees be liable for fraud or conspiracy.

In other words, to recover in their case the Kales had to prove to the jury that Cynthia Palmer did not aspirate vomitus in the operating delivery room. *But, we held that a jury had already decided that issue adverse to Kale.*

■ Our Ninth Court of Appeals in *Kale* held that under the doctrine of collateral estoppel essential elements of facts determined by a court of competent jurisdiction are binding on a subsequent action between the same parties and those who stand in privy with them. To put it more bluntly, the doctrine of collateral estoppel precludes the relitigation of issues litigated in a previous action even though the subsequent action is based upon an alleged different cause of action.

We held that collateral estoppel does not require that all the issues in the subsequent action be the same as those in a prior suit, but this doctrine precludes and disallows the same issues from being repleaded, reurged and relitigated. Therefore, under this record, in view of the lengthy pleading and jury findings in the first Liberty County case, there was a termination as to the malicious prosecution cause of action of Green. The termination was confirmed by our Ninth Court and the Supreme Court.

The contentions under this point made by the appellants seek to overturn the Supreme Court's opinion and rationale in *Scurlock Oil Co., supra*. Since the first Liberty County District Court judgment was final (as affirmed so to the Supreme Court) and because the pronouncement of the Supreme Court in *Scurlock*, a termination was effected—as well as the finality of a judgment. The termination defense and the final judgment defense are under this record identical. Both defenses failed. The evidence in the case at bar established that the final judgment was entered in favor of Green with respect to any of the appellants' Hartley County claims dealing with and involving the 247 head of cattle.

Appellants' point of error seven is to the effect that the evidence established that the Hartley County case was on appeal and was not terminated as a matter of law. We disagree. The Amarillo Court has terminated any questions about the validity of Green's malicious prosecution case based on the 247 head. The Supreme Court administered the "coup de grâce". No harm is shown by appellants. Indeed the Amarillo Court's opinion on the 247 head conclusively shows lack of harm. We overrule seven.

### Appellants' Argument that Green Sustained No Special Injury in the Malicious Prosecution Case

■ We additionally conclude that on this malicious prosecution cause of action which

was based on a prior civil action, Green must show and he did show by ample evidence that he has suffered interference *as to both his person and his property.* The record reflects that Green was required and indeed forced against his volition pursuant to certain pre-trial procedures and deposition notices to travel hundreds of miles from his home in East Texas to the Panhandle in order to be in attendance upon depositions and other pre-trial matters. Green suffered actual interference with his person by being required and forced as a practical matter to attend a jury trial in Channing, Hartley County, Texas. Further, there is no dispute that the injunction obtained by the appellants in Hartley County caused interference with Green's property. We conclude, therefore, that Green suffered and sustained special injury damages. His property, his cattle, his warranty, and especially his money were very substantially interfered with and he was damaged and injured substantially thereby.

His attorneys' fees in connection with the Hartley County litigation were found by the jury to be in the amount of $125,000 for past fees, expenses, and costs, and an additional $25,000 for reasonable and necessary attorneys' fees and costs in the future to be incurred in connection with the Hartley County litigation. Appellants place major reliance on *Oakcrest Civic Club v. Lowe,* 678 S.W.2d 93 (Tex.App.—Houston [14th Dist.] 1984, writ dism'd).

Appellants argue that in the *Oakcrest* case that a defendant filed a cross claim against the plaintiff for malicious prosecution. That is not our case at bar. The Court of Appeals reversed the judgment and rendered that the defendant (being the counter plaintiff) take nothing. The Fourteenth Court stated that it was clear that the appellees filed their suit prematurely in that *no judgment had been entered in any proceedings.* Green has a final judgment in Liberty County. There was a final judgment entered in the first Liberty County proceeding. Furthermore, the Fourteenth Court said that the counter plaintiffs failed to plead and prove a legal cause of action upon which a judgment could be rendered. The appellants' reliance upon *Oakcrest* is not sound.

Interestingly, appellants also place major reliance upon *Smart v. Carlton,* 557 S.W.2d 553 (Tex.App.—Beaumont 1977, writ ref'd n.r.e.). In that case, Don Smart and Jessie Smart had been husband and wife. They were divorced. A property settlement agreement was incorporated into the divorce decree. Later, Jessie Smart, the former wife, *filed a bill of review claiming that Don Smart had committed fraud.* The fraud was committed by omitting certain, important items of community property from the divorce accounting and Jessie sought a reformation of the decree and a judgment so as to award to her her proper, lawful, community property rights.

Carlton was Jessie's lawyer in the bill of review proceedings. He continued to represent her.

In the meantime, Don (who was both an attorney and a physician) filed a cross action against Jessie and Carlton alleging that Jessie's suit was merely for the purpose of vengeance, harassment, and intimidation and failed to state a cause of action as a matter of law and was barred as a matter of law. Don further alleged that the action of Jessie was malicious and for the purpose of harassment to gain money and that his own suit was a cause of action for abuse of process.

Carlton took the position that the cross action of Don, the former husband, was really a suit for malicious prosecution of a pending suit that had not been tried; that is to say, in the bill of review litigation. Carlton filed a motion for summary judgment supported by his affidavit. The Ninth Court of Appeals determined that the cross action filed by Don was manifestly one for malicious prosecution based on a civil suit. Our Ninth Court further held that one of the necessary elements of maintaining such a malicious prosecution suit is that it must be shown that the suit alleged had to have been prosecuted with malice and without probable cause *terminated in favor of the plaintiff claimant.* There our Court held that Don Smart did not allege and, indeed, could not allege that the suit filed by Jessie with Carlton as her attorney *ended in his favor. The parties were still in the actual trial of the bill of review. No judgment of any kind had been rendered.*

The Smart case is clearly not controlling here. It is inapposite.

We hold under this lengthy record and because of the fact that there have been three separate lawsuits between these parties; that therefore, there was interference with the person of Green and certainly there was interference with his money because of extensive and expensive but necessary and reasonable attorneys' fees and court costs that Green had to pay in view of other special injuries thrust upon Green in Liberty and Hartley Counties. The trials and the resulting appeals constituted special injury. This interference with Green's liquid property amounted to several hundred thousand dollars.

■ Importantly, the language defining "special injury" used in the court's instructions tracks very nearly verbatim the standards set forth in *Moiel v. Sandlin*, 571 S.W.2d 567 (Tex.Civ.App.—Corpus Christi 1978, no writ). The jury awarded $25,000 to Green for special injuries and damages to his business and personal reputation. This award adhered to *Moiel, supra*. In addition, the busy trial judge was faced with a number of appellants' requested instructions. One instruction which was requested by the appellants was that the jury be instructed that special injuries means actual, physical detention of a person or seizure of his property. We conclude that requested instruction was not correct in our case.

We conclude that there was no difference (certainly no meaningful difference) between the defendants' special requested instruction number eight and the instruction that the court gave. Any error thus was invited. Yet another special instruction was requested concerning special damages. It insisted that special damages had to mean actual interference with a party's property such as an appointment of a receiver or a writ of replevin or an injunction. We think that was overbroad. *But we notice that in Hartley County the appellants obtained an injunction against Green.* There is no error in this aspect of the charge. The multitude of suits and the several appeals make our case different. The large attorneys' fees and substantial costs and expenses satisfy the special

injury(ies) element. We overrule appellant's point of error number nine and other points of error dealing with special injury or damage elements. We overrule appellants' point eight.

We overrule appellants' point of error number ten. We conclude that the record shows a lack of probable cause on appellants' part and therefore, malicious prosecution ensued. The record reflects that O'Brien made certain repeated statements in the nature of threats that he would use court suits and he did so; in fact, (the jury could and did believe) the appellants used the Hartley County litigation as a means of harassing Green in an effort to break Green financially. The evidence supports the jury's verdict relevant thereto.

Furthermore, the lack of probable cause is evident from the appellants' continued pursuit of their claim to the 247 head even long after they lost these identical claims to the very same cattle—that is, the 247 head—in the first original district court suit in Liberty County. We overrule eleven because we determine that Green discharged his burden of proof as to lack of probable cause. Appellants' contention that probable cause was shown as a matter of law and the jury's answer thereto was against the great and overwhelming preponderance of the evidence is simply not *valid or sound.* This conclusion is correct because appellants did not have the burden of proof on this issue.

■ By point of error twelve the appellants charge that the trial court erred by excluding defendants' Bill of Exception from the evidence since it was relevant to defendants' probable cause issue.

We overrule additional points dealing with the trial court's exclusion of appellants' Bill of Exception evidence. We find that the same strains of evidence were cumulative. The exclusion of this Bill of Exception evidence fell well within the trial court's discretion. Any probative evidence therein was strongly and substantially outweighed by the clear danger of unfair prejudice. The proffered Bill of Exception, as tendered, was simply inadmissible. TEX.R.CIV.EVID. 403.

The Bill of Exception would have created a confusion of the issues and certain court orders therein would have been misleading to the jury.

Additionally, the Bill contained, in great measure, expert testimony on questions of law and mixed questions of law and fact. Such expert testimony must assist the trier of fact in determining fact issues. Thus, the same is subject to careful scrutiny by the trial court. TEX.R.CIV.EVID. 702. For the appellants to successfully obtain reversal of a judgment grounded upon error of the trial court in admitting or excluding evidence, the following must be shown:

(a) that in fact the trial court committed error; and

(b) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment

*Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394 (Tex.1989); *Bridges v. City of Richardson,* 163 Tex. 292, 354 S.W.2d 366 (1962); TEX.R.APP.P. 81(b)(1).

We decline to find reversible error on the rulings on excluding evidence where the excluded evidence is not controlling of a material issue that is dispositive of the litigation. Thus, we hold there was no error. We note that the Bill of Exception consumed about 31 or 32 pages. As an additional ground for our decision we have carefully reviewed for the second time the Bill of Exception. We decide that the entire Bill, as a unit, was tendered before the trial court with a request for the same to go to the jury.

Under this tender, all of the Bill had to be admissible. It was not. The trial judge did not err.

We think that this tendered Bill of Exception evidence was properly excluded since it violated the opinion, decision, rationale and philosophy of *Scurlock Oil Co., supra.*

The Bill of Exception evidence tendered, inter alia, certain court orders that were entered either while the first Liberty County judgment was on appeal or after the appeal had been decided adversely to appellants by our Ninth Court of Appeals. These court orders were entered in Hartley County on motions for summary judgment. These or-ders, we deem, were not relevant to this case. Also TEX.R.CIV.P. 97 disallowed these orders. The rule governing summary judgment practice is vastly different as to the quality of the evidence and the quantity thereof from the status of the evidence on an issue in a jury case; confusion to the jury would have resulted.

One of the excluded orders was an order for severance and transfer. It was signed on or about January 8, 1992, which was after our opinion of our Ninth Court of Appeals; no error is shown.

During the Bill, the appellants' testimony repetitiously and consistently revealed that they wanted to try again the issues and doctrines of *res judicata* and collateral estoppel; but those matters were not available for a second trial at that time. The record plainly proves that the appellants wanted to retry the issues on the 247 head; apparently they were determined to do so and the Hartley County jury so found. We necessarily adhere to the *Scurlock Oil* case. Point of error twelve is disallowed.

Appellants group points of error thirteen, fourteen, fifteen, sixteen, and seventeen. These points challenge instructions one, two, three, four, and five in the court's charge. The challenges are uniform. Each instruction is said to be a comment on the weight of the evidence. We determine that each instruction is not a comment on the weight of the evidence. The trial judge was pronouncing the Texas law and he did so correctly. The instructions were correct. But the same were made necessary by the present language of TEX.R.CIV.P. 277. Rule 277 mandates that the court submit broad-form questions. The rule, by Justice Cook's diktat, means exactly what it says.

Rule 277 states that the trial court *shall* submit such instructions as *shall* be proper to enable the jury to render a verdict. The first paragraph of Rule 277 uses the mandatory verb "shall" twice. And in this case we interpret the phrase "shall be proper to enable the jury to render a verdict" to mean that such instructions need only be helpful or of assistance or merely facilitative to the jury in reaching a verdict.

We also hold, however, that these challenged instructions were proper under the substantive and procedural law. Query: Does "proper" modify only instructions and definitions or does "proper" also mean facilitating and making it easy for the jury to reach a verdict? We think it is salutary and correct to give this word "proper" both meanings in this case under this record.

The trial court abused no discretion in the instruction on final judgments. The district judge was assiduously following Supreme Court law. The instructions on compulsory counterclaims were correct as we have determined elsewhere in this opinion. Again, this record is unique. The final judgments in both Liberty County and Hartley County had become more than final because of the actions of the Beaumont Court of Appeals and the Amarillo Court of Appeals and the Supreme Court. Hence, no harm is shown. Absolute harmlessness is conclusively proved—especially as to the 247 head. The instructions one, two, three, four, and five possessed, as of now, no probability of bringing about an improper judgment. TEX. R.APP.P. 81(b)(1). Points of error thirteen, fourteen, fifteen, sixteen, and seventeen are overruled.

█ We hold that necessary and reasonable attorneys' fees and costs even though expended and incurred in previous litigation can be recovered as proper damages in a later suit based on tortious interference of contract. This ruling is, we conclude, a necessary exception to the general rule. We acknowledge that the general rule states, unless provided for by statute or by contract of the parties, attorneys' fees incurred by a party in older litigation are not recoverable against the present adversary in new, current litigation. The exception to the general rule is where the natural and proximate results and consequences of prior wrongful acts had been to involve a plaintiff, situated as Green, in litigation with and against third parties and other parties.

We specifically hold, inter alia, that Green had a right to recover his attorneys' fees and costs in the Hartley County litigation, as to past proceedings, whether or not such recoveries and attorneys' fees were germane to

O'Brien and Texas Beef or Cargill or any of the other litigants involved. This ruling is correct because O'Brien and Texas Beef forced Green into the Hartley County case in a wrongful manner as observed above. Texas Beef and O'Brien were the original movers, pleaders, and authors of the Hartley County litigation against Green; they were the tortious interferers.

Also, Green's attorneys' fees in Hartley County are so intertwined and enmeshed as to be incapable of any meaningful, realistic segregation. It would be virtually impossible to separate attorneys' services in defending against Texas Beef, O'Brien, Cargill, Los Ninos Cattle Company, Bass and White, and others. Therefore, appellants' point of error eighteen is overruled.

Appellants' point of error nineteen attacks the punitive damages awarded against O'Brien as being excessive and not proportionally related to the actual damages. The "not proportionally" contention is clearly not sustainable.

█ Without any criticism whatsoever toward any party or counsel and with due deference to all counsel in appellants' point of error nineteen (A), the challenge contains two paragraphs. In the two paragraph discussion reference is made only to five lines of testimony.

The lines of testimony set out in appellants' brief are that "he [O'Brien] would carry me [Green] to the highest court until he [O'Brien] eventually wears me [Green] down." Green responded, "Well, Mr. O'Brien, I can't stay with you.... I ain't got the money that you've got. You'll eventually break me if you just keep dragging me from one court to another."

These threats—which the jury had a right to weigh and believe having been made by O'Brien—are horrendous and horrific to an order buyer's financial life and death. Green was so situated. O'Brien never denied these threats. O'Brien did not even attend the second Liberty County trial below. O'Brien was on regular, long-planned vacation with his family. As we comprehend the statement of facts, O'Brien took Green aside and detained Green while making one of the

threats. This action was an interference with Green's person. Special injury was proven. No authority was cited in point of error nineteen (A). Appellants candidly admit that they continued the litigation in Hartley County.

Our Ninth Court cannot countenance or condone such threats; we hold such threats destroy the defense of privilege in the tortious interference case and destroy the defense of probable cause in the malicious prosecution suit; such threats prove lack of probable cause against the appellants; and such threats constitute interference with the person and personality of Green.

Appellants make no complaint about lack of a bifurcated trial on the exemplary damage issues. Thus, *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10 (1994) is not implicated on "bifurcation". Justice Cornyn wrote that the *Moriel* opinion applies only to trials in the future. We quote: "The standards we announce apply to all punitive damage cases tried in the future."

We have considered the unique facts of this particular case, weighing the nature of the wrong, the character of the conduct involved (being the threats, the other acts, the continuing prosecution of the complex Hartley County case), the seriousness of the blameworthiness of the wrongdoer, the situations and the sensibilities of the parties concerned and the extent that the offending conduct insults the public sense of justice and propriety.

We overrule point of error nineteen (A).

■ Point of error nineteen (B) argues that the punitive damages were excessive and not related to actual damages. The jury awarded Green $175,000 in damages. The $500,000 assessed as exemplary damages in less than a 3:1 ratio.

This case, however, is especially egregious because the first Liberty County lawsuit resulted in a final judgment in favor of Green. Green's attorney made appellants fully aware of the *Scurlock Oil Co.* rule, yet appellants pushed forward the Hartley County litigation.

The threats of O'Brien, the jury could perceive, reflected the "degree of culpability of the wrongdoer". The final two *Kraus*[2] factors, "the situation and sensibilities of the parties concerned" and "the extent to which such conduct offends a public sense of justice and propriety" are subjective.

Yet it is common, popular knowledge that there is a growing wide-spread distaste for increasing litigation, especially duplicitous, repetitive litigation.

The jury found that O'Brien, acting for Texas Beef, maliciously continued and prosecuted the Hartley County lawsuit despite the first Liberty County final judgment which was based upon the extensive verdict. O'Brien's motives, if his threats were to be believed and carried out in actions as well as words, were on the whole meant to ruin Green financially and cause Green's economic death. The evidence, taken in its entirety, is there to sustain the jury's award of $500,000. The jury's award is not excessive.

We have attempted to follow the opinion of Justice Gonzalez in *Ellis County State Bank, et al v. Keever*, 37 Tex.Sup.Ct.J. 1117, 1994 WL 278170, handed down June 22, 1994. *Keever* is an opinion on malicious prosecution.

In *Moriel*, Justice Cornyn set out certain standards to be applied to all punitive damage cases tried in the future, thus, under Justice Cornyn's clear language, *Moriel* is not applicable to this appeal. We have carefully heeded and followed the plain language of Chief Justice Walker in *Mauriceville National Bank v. Zernial*, 880 S.W.2d 282 (Tex. App.—Beaumont 1994, n.w.h.).

No criticism of any counsel is intended as to any point of error—especially nineteen (A) and nineteen (B). Counsel could not have anticipated *Moriel, supra,* and *Keever, supra,* and their diktats. Thus, counsel could not have tried this case, nor briefed this case, nor argued this case before us in strict conformity to *Moriel* and *Keever.*

Here, the trial was conducted and the appeal taken without the benefit of *Moriel* and *Keever. Moriel,* as now written, dictates

---

**2.** They are delineated in *Alamo Nat. Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981).

new procedural standards and the Supreme Court provided that the new procedural standards apply to "all punitive damage cases tried in the future".

Justice Cornyn announced new duties and responsibilities thrust upon the courts of appeals in reviewing the evidence on punitive damages awards. We quote:

### B. Court of Appeals Review of the Evidence

A court of appeals may vacate a damage award or suggest a remittitur only if the award is "so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust." (citations omitted). A court of appeals is also governed by this same standard when reviewing a trial court's suggestion of remittitur. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640 (Tex.1987). While we do not alter this level of appellate defense, we emphasize that courts of appeals must carefully scrutinize punitive awards to ensure that they are supported by the evidence. We have already held in *Pool [v. Ford Motor Co.]* that courts of appeals, when reversing on insufficiency grounds, should detail the evidence in their opinions and explain why the jury's finding is factually insufficient or is so against the great weight and preponderance of the evidence as to be manifestly unjust. 715 S.W.2d [629], at 635. Due to the jury's broad discretion in imposing punitive damages, we believe that a similar type of review is appropriate when a court of appeals is *affirming* such an award over a challenge that it is based on insufficient evidence or is against the great weight and preponderance of the evidence. This will ensure careful appellate review of the punitive award, and allow this court to determine whether the court of appeals correctly applied the *Kraus* factors. *Thus, we hold that the court of appeals, when conducting a factual sufficiency review of a punitive damages award, must hereafter detail the relevant evidence in its opinion, explaining why that evidence either supports or does not support the punitive damages award in light of the Kraus factors.* (emphasis added)

With respect, the meaning timewise of the diktat holding that the court of appeals (when conducting a factual sufficiency review of a punitive damages award) "must hereafter detail" is not clear. Query: Does "hereafter" mean appeals started or perfected after the date of June 8, 1994? A second query: Does "hereafter" mean an appeal that was perfected, briefed, argued, and considered by a court of appeals but not finally decided by the court of appeals by way of opinion? The latter situation is where the court of appeals has performed all of its duties and functions and circulated drafts of opinions or issued opinions before June 8, 1994.

Then, query: What about the procedural situation wherein an opinion has been handed down but a lengthy motion for rehearing is being considered?

Nevertheless, we overrule appellants' point of error nineteen (B).

■ Point of error twenty involves the awarding of pre-judgment interest on the attorneys' fees. Appellants argue the pre-judgment interest should run only on those attorney's fees which were actually paid prior to trial. In *C.T.W. v. B.C.G.*, 809 S.W.2d 788, 795 (Tex.App.—Beaumont 1991, no writ) we held a party was entitled to recover pre-judgment interest on the *entire* amount of damages he is *awarded* in the judgment. This point of error is overruled.

We have applied, as noted above, the correct standards of appellate review and therefore, we overrule appellants' point of error number eighteen dealing with attorneys' fees, number nineteen dealing with punitive damages, number twenty dealing with the award of pre-judgment interest, and number twenty-one dealing with the award of post-judgment interest.

We determine that post-judgment interest on the attorneys' fees for appellate work, appellate briefs, and appellate oral submissions begins to run from the date of the intermediate appellate court's first opinion. These are reasonable, simple, mathematical calculations.

The courts of appeals have no obligation to detail the supportive evidence as to actual damages. But we think we have done so. And we have done so at considerable length.

Under the entire record, this litigation was a case for a jury's determination. The evidence was conflicting and that is exactly what the jury was and is for. It is the jury's sole and exclusive prerogative to determine the facts. The peers of all the parties have now spoken in three separate and distinct verdicts. Each such verdict, in their governing questions and findings, favored Green. A court of appeals cannot act as a super jury. The Texas Constitution forbids it. The jury findings are inviolate. TEX. CONST. art. I § 15.

Having reviewed the record, we hold that the jury questions and the jury's answers relevant to the malicious prosecution cause of action were proper and correct and the instructions and definitions thereto were proper and correct. We find ample and sufficient evidence of strong probative force and valuation to sustain the jury's answers. Thus, the judgment below is affirmed on a two-fold basis; it is affirmed on the tortious interference theory and separately and independently on the malicious prosecution theory.

AFFIRMED.